2012 UT 84

### SALT LAKE CITY CORPORATION, Petitioner and Appellee,

v.

**JORDAN RIVER RESTORATION NETWORK, Danny Potts, Nancy L. Saxton, Jan R. Bartlett, Karen Potts, M. Ray Kingston, Raymond W. Wheeler, Hans Ehrbar, Lucy Knorr,** and all taxpayers, property owners, and citizens of Salt Lake City, Utah, including nonresidents owning property or subject to taxation therein, all other persons having or claiming any right, title, or interest in any property or funds affected by or to be affected by the general obligation bonds of Salt Lake City, to be issued for a multipurpose regional sports, recreation and education complex; and Mark Shurtleff, Attorney General, Defendants and Appellants.

Nos. 20110316, 20110582.

Supreme Court of Utah.

Dec. 14, 2012.

---

493. *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (second alteration in original) (internal quotation marks omitted).

494. *Id.*

994

Jordan River Restoration Network, Danny Potts, Nancy L. Saxton, Jan R. Bartlett, and Karen Potts.

M. Ray Kingston, Raymond W. Wheeler, Hans Ehrbar, Lucy Knorr, Salt Lake City, pro se.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 This case involves Salt Lake City's (City) petition to validate municipal bonds pursuant to the Bond Validation Act (Validation Act). In 2003, the City asked voters to approve Proposition No. 5, which proposed the issuance of bonds to finance construction of a "Regional Sports, Recreation and Education Complex." Voters approved the bonds. Years later, in 2011, the City authorized issuance of the bonds with Resolution No. 12 and then filed a petition to validate the Proposition No. 5 bonds in district court. Validation is an optional, expedited procedure that permits a governing body to obtain both a judicial declaration that proposed bonds are legal and an injunction preventing any future challenge to the validity of the bonds. Danny Potts, Nancy Saxton, and the Jordan River Restoration Network (collectively, Restoration Network) retained counsel and appeared in opposition to the City's petition. Additionally, Ray Kingston, Raymond Wheeler, Hans Ehrbar, and Lucy Knorr (collectively, Citizens) appeared pro se and opposed the City's petition. Together, the Restoration Network and Citizens (collectively, Appellants) challenged the bonds' validity on a variety of statutory and constitutional grounds. The district court considered their claims, denied them, and granted the City's validation petition.

¶ 2 Both the Restoration Network and Citizens appealed. We consolidated their appeals into this case. Together, the Appellants raise seven claims that they believe render the bonds invalid and illegal. Generally, the Appellants claim that the validation proceedings conducted by the district court deprived them of due process and violated the Validation Act. They also argue that validation was not proper because the City's

J. Wesley Robinson, Evelyn J. Furse, Edwin P. Rutan II, Salt Lake City, for appellee.

David Bernstein, Karthik Nadesan, Ivan W. Lependu, Salt Lake City, for appellants

authorization of the bonds did not comply with the Local Government Bonding Act (Bonding Act).

¶3 We hold that the district court conducted the validation proceedings in compliance with due process and the Validation Act, and that it correctly granted the City's petition to validate the Proposition No. 5 bonds. The validation proceedings conducted by the district court protected Appellants' due process rights to notice and an opportunity to be heard. Upon receipt of the City's validation petition, the district court properly ordered publication of notice. This notice appeared in the *Intermountain Commercial Record* (*Commercial Record*) and on the Utah Legal Notices website and it satisfied the requirements of due process. As a result, Appellants were properly served with process and subject to the personal jurisdiction of the district court. The notice also provided Appellants with adequate time to prepare for the validation hearing. Additionally, the procedures employed by the district court at the validation hearing protected Appellants' due process rights by providing them with a meaningful opportunity to be heard. In particular, the district court permitted Appellants to testify, examine witnesses, and present closing arguments.

¶4 The district court also correctly applied both the Validation Act and the Bonding Act. It accurately concluded that the Validation Act provides a narrow, expedited procedure limited to consideration of the validity of the bonds as financial instruments and does not permit consideration of collateral matters, such as land use and zoning laws, that relate to implementation of the underlying project. Similarly, the district court correctly held that collateral documents did not create binding terms for Proposition No. 5. The project now proposed by the City is consistent with what the City advertised to voters in its statutorily required notice and falls within the bounds of the City's discretion. Finally, the district court properly determined that Resolution No. 12 complied with the Bonding Act and authorized issuance of the bonds. While Resolution No. 12 is subject to a final bond resolution, the constraints it establishes for material bond terms, like the bonds' prin-

cipal and interest rate, permit it to authorize bond issuance and serve as the foundation for the validation petition. Because we conclude that the district court complied with due process and properly applied the Validation and Bonding Acts, we affirm its grant of the City's validation petition.

## BACKGROUND

### I. THE PROPOSITION NO. 5 BOND ELECTION

¶5 On September 9, 2003, the City adopted Resolution No. 39, which proposed six bond issues. Only Proposition No. 5 is relevant to this case. Proposition No. 5 asked voters the following question:

Shall Salt Lake City, Utah, be authorized to issue and sell general obligations bonds of the City in an amount not to exceed Fifteen Million Three Hundred Thousand Dollars ($15,300,000) and to be due and payable in not to exceed twenty (20) years from the date or dates of the bonds for the purpose of paying the costs of acquiring, constructing, furnishing and equipping a multi-purpose regional sports, recreation and education complex and related roads, parking and improvements?

The City scheduled the bond election for Proposition No. 5 contemporaneously with the November 2003 general election.

¶6 Prior to the November election, the City sent out a Voter Information Pamphlet (Pamphlet) describing the six bond propositions. The description for Proposition No. 5 was titled "Regional Sports, Recreation and Education Complex." The Pamphlet identified the site for the proposed complex as "212 acres at 2000 North and 2000 West." It then described the purposes of the project as:

● To acquire, construct, furnish and equip a multi-purpose regional sports, recreation and education complex.

● To accommodate the growing needs of youth and adults, participating in organized sports such as soccer, rugby, lacrosse, football and baseball.

● To relieve community and neighborhood parks of continuous high-intensity, multi-

use activities that negatively impact park lands.

- To create economic development opportunities by drawing regional and national events.

¶ 7 The Pamphlet also articulated the following "details" for the complex:

- The Jordan River, which runs along the eastern border of the complex, will be preserved as a natural habitat for both plants and wildlife. Access to the river corridor will be preserved for recreation.

- Complex may also include an indoor structure to support field sports and a nature component to support education.

- Fee-based, scheduled events (e.g., league and tournament play) will help generate revenue, offsetting operation and maintenance costs.

- User groups are committed to raise $7.5 million from other government, community, and constituent user groups to augment bond funding.

¶ 8 After articulating the complex's purpose and details, the Pamphlet described the cost associated with approval of Proposition No. 5. The Pamphlet estimated that an average homeowner would pay $7.75 per year for the cost of the bonds and $2 per year for ongoing maintenance of the complex. It then estimated that the cost to a small business would be $14 per year while the cost to a large business would be $81 per year.

¶ 9 In advance of the November election, newspapers reported on Proposition No. 5. In particular, the *Salt Lake Tribune* published an October 23, 2003 article on the subject. The article appeared in the newspaper's opinion section and its authorship was attributed to the *"Salt Lake Tribune."* The article outlined the complex's anticipated features, costs, and location and recommended voter approval. It specifically stated that the complex would include thirty soccer fields, two rugby fields, and eight baseball fields on a 212-acre site.

¶ 10 On November 4, 2003, the voters of Salt Lake City approved Proposition No. 5 by a vote of 20,475 to 19,454. Parties had until December 23, 2003 to contest the validity of the bond election. No party raised such a challenge.

¶ 11 After the validation hearing, the district court issued Findings of Fact and Conclusions of Law explaining the City's "current" proposal for the complex. The district court stated that the complex, as proposed, will be located on a 160-acre site near the Jordan River and will include fifteen multiuse fields and one championship field. The court further stated that the current proposal does not include any baseball fields but that it does include a natural buffer between the athletic fields and the Jordan River. Finally, the court stated that the proposal also includes a variety of infrastructure, including parking, roads, restrooms, concession areas, maintenance buildings, and administration buildings.

## II. AUTHORIZATION OF THE PROPOSITION NO. 5 BONDS

¶ 12 In 2010, the City began proceedings to authorize issuance of the Proposition No. 5 bonds. On February 5, 2010, the City posted and published notice of a February 9, 2010 public hearing to be held regarding authorization of the bonds. At the scheduled hearing, the City adopted Resolution No. 12, which provided initial authorization for the bonds. Resolution No. 12 established the maximum aggregate principal, the maximum number of years to maturity, the maximum interest rate, and the maximum discount from par for the bonds. The resolution also acknowledged that it did not set the final terms of the bonds, but that the final terms would be set pursuant to a Final Bond Resolution to be adopted by the City. The Final Bond Resolution was attached to Resolution No. 12. Resolution No. 12 stated that the terms of the Final Bond Resolution could not exceed the terms it set forth, including the maximum principal, interest rate, discount rate, and years to maturity.

¶ 13 Resolution No. 12 also provided for a public hearing to satisfy the requirements of section 11-14-318 of the Utah Code. It ordered publication of notice of a public hearing to be held on March 2, 2010. The City posted notice at City Hall on February 11,

2010, although the posting contained an inaccurate title. Notice was published on the Utah Legal Notices website the same day. The City also published notice of the hearing on February 13 and 20 in the *Salt Lake Tribune* and the *Deseret News*. The hearing was held on its scheduled date and fifteen citizens appeared to express opposition to issuance of the bonds. The City held a second public hearing on December 7, 2010. It published notice of the hearing in the *Salt Lake Tribune*, the *Deseret News*, and on Utah Legal Notices. At the December 7 hearing, the City accepted spoken and written comments in opposition to the bonds from seventeen citizens.

### III. THE BOND VALIDATION PROCEEDING

¶ 14 On October 7, 2010, the Restoration Network filed a lawsuit seeking to enjoin the issuance of the bonds. The City responded by filing a separate petition to validate the bonds pursuant to the Validation Act.[1] As required by section 11-30-3(2) of the Utah Code, the petition named the following defendants:

> [A]ll taxpayers, property owners, citizens of the public body, including nonresidents owning property or subject to taxation therein, all other persons having or claiming any right, title, or interest in any property or funds affected by or to be affected by the bonds, all parties to any contract or instrument which is part of the validation proceedings....

> In accordance with the Validation Act, the petition also named the attorney general as a defendant. *See* UTAH CODE § 11–30–3(2). If successful, the City's validation petition will permanently enjoin the Restoration Network's separate lawsuit, and any future challenges to the validity of the bonds. *Id.* § 11-30-11(1)–(2).

¶ 15 Pursuant to the Validation Act's requirements, the district court scheduled a hearing on February 9, 2011. It published daily notice of the hearing between January 18 and February 1 in the *Commercial Record* and on Utah Legal Notices.

¶ 16 The district court issued a Decorum Order on February 3, 2011, defining the procedures to be used during the validation hearing. Notably, the Decorum Order set time limits for each party's presentation. In particular, it granted the City twenty minutes, the Attorney General ten minutes, and the defendants three minutes each.[2]

¶ 17 On February 4, 2011, prior to the scheduled February 9 hearing, the Restoration Network filed a Motion for Order for Mailing of Notice and/or Publication of Notice in the *Salt Lake Tribune* and the *Deseret News*. In support of its motion, the Restoration Network argued that notice publication in the *Commercial Record* failed to satisfy the requirements of due process, did not constitute proper service of process, and that the district court had therefore failed to establish personal jurisdiction over them. The Restoration Network requested that the district court continue the February 9 hearing and issue notice by mail to all taxpayers or, in the alternative, publish notice in the *Salt Lake Tribune* and the *Deseret News*.

¶ 18 The district court heard oral argument on the motion at the February 9 hearing and denied the motion from the bench. It memorialized its decision in a written ruling several weeks later. The ruling held that the notices provided in the *Commercial Record* and on Utah Legal Notices satisfied the constitutional requirements of due process and the statutory requirements of section 11-30-5 of the Utah Code.

¶ 19 The district court held the validation hearing on February 9, 2011. The City, Restoration Network, Citizens, and the Attorney General all appeared and participated. The district court heard motions and received testimony, permitted witnesses to be called and examined, and received briefing and other evidence. Notably, the district court heard testimony regarding environmental issues from Citizens.

¶ 20 The Attorney General presented a motion requesting that he be dismissed as a

---

1. The City amended its petition on February 7, 2011.

2. The district court amended its Decorum Order on February 8, 2011.

defendant pursuant to section 11-30-6(1) of the Utah Code, which permits dismissal if the Attorney General finds that no reasonable question as to the validity of the bonds exists or that other parties will competently contest the validation petition. The Attorney General submitted that, after carefully reviewing the validation petition, he saw nothing that was "invalid or deficient in any manner." He also noted that the Restoration Network could competently contest the validation petition. The district court granted the Attorney General's motion and dismissed him as a defendant.

¶ 21 At the conclusion of the validation hearing, the district court stated that the parties could file a "response" in writing prior to issuance of its decision. The court received six letters from defendants expressing their intent to supplement the record. The district court thereafter entered a Minute Entry clarifying that any responses would be limited to "written summations, or argument" and that new evidence would not be accepted. Some parties, nonetheless, submitted new evidence, and others filed objections to the Minute Entry. The district court overruled the objections to the Minute Entry and limited its consideration to evidence admitted during or before the validation hearing.

¶ 22 The district court entered Findings of Fact and Conclusions of Law on March 30, 2011. The conclusions of law first clarified that the scope of the validation proceeding was "narrow," and "not subject to much of the law cited by defendants, including law governing zoning and land use decisions." The district court then addressed whether Resolution No. 12 provided sufficient authorization to permit the City to pursue validation. It held that the resolution was sufficiently final to permit the City to pursue validation, reasoning that Resolution No. 12 "is an action of significant legal substance" and that "[t]he sequence followed here is legal, and practically necessary to effectuate the bond sale." The conclusions of law also addressed whether statements in the Pamphlet bound the City and whether the project, as currently envisioned, was within the scope of the City's discretion. The district

court determined that the Pamphlet is a collateral document and "[t]he City is not bound by its statements." It also found that "the present proposal is well within the City's discretion." Ultimately, the court held that "[t]he City[ ] has met its burden to establish every necessary allegation of its Amended Petition, and is entitled to an Order ... determining that the [b]onds ... are valid." It then directed the City to "prepare an appropriate Order consistent with these Findings of Fact and Conclusions of Law."

¶ 23 The parties negotiated regarding the terms of the written order, but failed to come to an agreement. The City nevertheless submitted a proposed written order. The Restoration Network filed an Objection to Revised Proposed Order of Judgment. The Restoration Network objected to the following language proposed by the City: "The City, pursuant to notice properly given, held on March 2, 2010, the public hearing required by Utah Code section 11-14-318 ... and the notice of intent to issue bonds was validly given on February 11, February 13, and February 20, 2010." The Restoration Network argued that the proposed language exceeded the scope of the district court's Findings of Fact and Conclusions of Law. Alternatively, the Restoration Network proposed that the order state, "[n]otice of the March 2, 2010 City Council Meeting and notice of intent to issue bonds were properly noticed." The district court adopted the Restoration Network's proposed language.

¶ 24 The Restoration Network filed a notice of appeal. It amended this notice after the district court issued its final written order. Citizens filed a separate notice of appeal. We consolidated the two appeals. We have jurisdiction to hear this consolidated appeal pursuant to sections 11-30-10(1) and 78A-3-102(3)(j) of the Utah Code.

## STANDARD OF REVIEW

¶ 25 This appeal presents seven issues, and the parties dispute the standard of review applicable to some of these. For clarity, we begin our analysis of each issue by addressing the appropriate standard of review.

## PRESERVATION

¶ 26 The City challenges whether the Restoration Network and Citizens properly preserved several of the issues they raise on appeal. We discuss whether the Appellants preserved individual issues below, with our analysis of those issues. For brevity, however, we set forth our preservation rule here.

 ¶ 27 Generally, to preserve an issue for appeal, the party asserting error must (1) specifically raise the issue, (2) "in a timely manner," and (3) support the claim with "evidence and relevant legal authority." *Donjuan v. McDermott*, 2011 UT 72, ¶ 20, 266 P.3d 839. The only exceptions to this general rule are instances involving exceptional circumstances or plain error. *Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828.

 ¶ 28 Our preservation rule promotes both judicial economy and fairness. *Id.* ¶¶ 15–16. The rule furthers judicial economy by "giv[ing] the [district] court an opportunity to address the claimed error, and if appropriate, correct it" prior to an appeal. *Id.* ¶ 15 (internal quotation marks omitted). Next, it encourages fairness by giving an opposing party "an opportunity to address the alleged error in the [district] court." *Id.* ¶ 16. Similarly, the rule "prevents a party from avoiding [an] issue at trial for strategic reasons only to raise the issue on appeal if the strategy fails." *Id.* (internal quotation marks omitted).

 ¶ 29 Rule 24(a)(5) of the Utah Rules of Appellate Procedure complements the preservation rule. It requires an appellant's brief to provide "[a] statement of the issues presented for review" and a "citation to the record showing that [an] issue was preserved in the [district] court." However, in the case of an appellant who appears pro se, we retain discretion to address issues raised that do not strictly comply with the requirements of rule 24. *See Cedar City v. Child*, 2002 UT App 133U, para. 1, 2002 WL 724483 (per curiam).

## ANALYSIS

¶ 30 Appellants argue that the district court erred when it granted the City's petition to validate the Proposition No. 5 bonds. They raise seven issues. First, Appellants argue that validation proceedings are broad in scope and must include consideration of any matter that may affect the validity or legality of the bonds, including land use, zoning, and environmental laws. Second, they assert that notice of the validation hearing provided by the district court did not comply with the Validation Act. Third, Appellants contend that notice of the validation hearing published in the *Commercial Record* and on Utah Legal Notices was inadequate and violated their due process rights. Fourth, Citizens assert that the validation hearing did not provide them with the meaningful opportunity to be heard that due process requires. Fifth, Appellants argue that the project currently proposed materially differs from the project the City proposed to voters. Sixth, Appellants claim that the City failed to comply with the Bonding Act because it did not provide final authorization of the bonds prior to filing its validation petition, and it did not hold a timely hearing pursuant to section 11-14-318 of the Utah Code. Seventh, Citizens challenge the district court's statement that the bond validation petition did not present a close case.

¶ 31 We are not persuaded by any of the seven issues raised by Appellants. As a result, we affirm the district court's grant of the City's validation petition.

## I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT VALIDATION PROCEEDINGS ARE NARROW IN SCOPE

### A. Standard of Review

 ¶ 32 "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 (internal quotation marks omitted).

### B. Preservation

¶ 33 Citizens argue that a bond validation proceeding must encompass any matter that may affect the legality of a bond, including environmental and land use laws. The City

correctly notes that Citizens fail to identify where in the record they preserved this issue.

■ ¶ 34 Citizens failed to strictly comply with rule 24(a)(5)of the Utah Rules of Appellate Procedure, which requires "[a] statement of the issues presented for review" and a "citation to the record showing that [an] issue was preserved in the [district] court." But the argument section of their opening brief does provide record citations identifying where they asked the district court to consider a broad range of issues that may affect the validity of the bonds. Of note is the following exchange between pro se appellant Hans Ehrbar and the district court. Mr. Ehrbar began testifying about the potential consequences of global warming on the proposed complex. The court paused Mr. Ehrbar and informed him that bond validation proceedings have a narrow scope and that "there's other litigation pending in other venues that may or may not get into these issues." Mr. Ehrbar argued that environmental issues impacted the feasibility of repaying the bond. The court disagreed with Mr. Ehrbar and stopped his testimony, noting that the validation hearing was not the proper place to raise environmental issues. This exchange, along with others over the course of the proceedings, notified the district court that Citizens sought to address a wide variety of issues within the validation proceeding. Nevertheless, the court concluded that "the issues before the [c]ourt are narrow, they are defined by statute, and they are not subject to much of the law cited by defendants, including [the] law governing zoning and land use decisions." Thus, Citizens did raise their claim regarding the scope of the validation proceedings and the district court was aware of their position. As a result, we elect to grant them leniency from strict compliance with rule 24(a)(5) and we address the merits of their claim.

### C. Merits

■ ¶ 35 Citizens argue that the district court "must cast a wide net to consider and evaluate *any* matter relating to the legality and validity of the bond." In particular, Citizens contend that the district court should have considered "the Clean Water Act, the Land & Water Conservation Fund Act, local zoning ordinances, sovereign land laws, and flood plain regulations." We disagree. The Validation Act establishes a narrowly focused, expedited procedure to validate proposed bonds; this procedure does not contemplate consideration of broader issues related to the project, including land use, zoning, and environmental laws.

■ ¶ 36 When presented with a question of statutory interpretation, "[o]ur primary objective . . . is to give effect to the intent of the [L]egislature." *State v. J.M.S. (In re J.M.S.)*, 2011 UT 75, ¶ 13, 280 P.3d 410. To do so, we first look to a statute's plain language. *Id.* "Often, statutory text may not be plain when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Id.* In light of this, "our interpretation of a statute requires that each part or section be construed in connection with every other part or section so as to produce a *harmonious whole*." *Id.* (internal quotation marks omitted).

¶ 37 We begin our analysis with the plain language of the Validation Act. The Act permits a public body to "file a petition to establish the validity of . . . bonds." Utah Code § 11-30-3(1). It generally defines validity to mean "any matter relating to the legality and validity of the bonds and the security therefor . . . without limitation."[3] *Id.* § 11-30-2(9). It then specifies ten categories relevant to the legality and validity of

---

**3.** The complete statutory definition of "validity" reads as follows:

> (9) "Validity" means any matter relating to the legality and validity of the bonds and the security therefor, including, without limitation, the legality and validity of:
>
> (a) a public body's authority to issue and deliver the bonds;
>
> (b) any ordinance, resolution, or statute granting the public body authority to issue and deliver the bonds;

> (c) all proceedings, elections, if any, and any other actions taken or to be taken in connection with the issuance, sale, or delivery of the bonds;
>
> (d) the purpose, location, or manner of the expenditure of funds;
>
> (e) the organization or boundaries of the public body;
>
> (f) any assessments, taxes, rates, rentals, fees, charges, or tolls levied or that may be levied in connection with the bonds;

bonds. *Id.* Citizens rely on one of these ten enumerated categories, section 11–30–2(9)(d), to argue that a bond validation proceeding must include review of any matter related to the legality and validity of the project for which the proposed bonds will be issued. Section 2(9)(d) states that " '[v]alidity' means ... the legality and validity of ... the purpose, location, or manner of the expenditure of funds." It is not unconstrained, as Citizens suggest. The phrase "expenditure of funds" limits the scope of "purpose, location, or manner" and forecloses consideration of "any matter," including construction of the proposed project. We also note that the phrase "without limitation" in section 2(9) does not expand the definition of "validity" to include consideration of any matter. Instead, "without limitation" is constrained to matters related to the "bonds" and "the security." Thus, the plain language of section 2(9) does not permit consideration of other matters.

■■■ ¶ 38 To further evaluate the scope of what may properly be considered under section 2(9)(d), we look to its context. "Under the doctrine of [ejusdem] generis, we read a statute's use of a term or phrase as restricted to include things of the same kind, class, character, or nature as those specifically enumerated." *Whitney v. Div. of Juvenile Justice Servs.,* 2012 UT 12, ¶ 14, 274 P.3d 906 (internal quotation marks omitted). It is significant that subsection (d) is one of ten enumerated categories in section 2(9). Nine of these enumerated categories focus narrowly on a governing body's authority to issue bonds, the legality of the proceedings conducted in connection with bond issuance, and the validity of the bonds as a security. See UTAH CODE § 11-30-2(9)(a)–(c), (e)–(j). That every enumerated category other than section 2(9)(d) is narrowly focused on the validity of bonds as financial instruments, and not

(g) any lien, proceeding, or other remedy for the collection of those assessments, taxes, rates, rentals, fees, charges, or tolls;
(h) any contract or lease executed or to be executed in connection with the bonds;
(i) the pledge of any taxes, revenues, receipts, rentals, or property, or encumbrance thereon or security interest therein to secure the bonds; and
(j) any covenants or provisions contained in or to be contained in the bonds. If any deed,

the validity of the project for which the bonds will be issued, weighs strongly in favor of construing section 2(9)(d) in a similarly narrow manner.

¶ 39 This narrow construction of subsection (d) is supported by construing the purpose and language of the Validation Act as a whole. The Act contemplates an expedited process and such an approach is simply not compatible with Citizens' argument that "any matter" may be considered in a validation proceeding. The Act requires that "[u]pon the filing of the [validation] petition, the court shall issue an order" notifying defendants of a validation hearing. *Id.* § 11-30-4. The hearing must occur within one month of the court's order. *Id.* ("The time of the hearing shall be not less than 20 nor more than 30 days from the date of the issuing of the [notice] order."). Next, the Act directs the district court to manage the proceedings in the way that will best enable it to "enter a judgment with the least possible delay." *Id.* § 11-30-7 (2011)[4] ("To the extent possible and practicable under the circumstances," this judgment "shall be rendered within ten days after the hearing is concluded."). Finally, the Validation Act provides for expedited appellate review. *Id.* § 11-30-10(1)–(2) (2011) ("An appeal may be taken only to the Supreme Court .... No appeal is allowed unless the notice of appeal is filed within ten days after the date of entry of the judgment. The Supreme Court shall expedite and give priority to the hearing and decision on appeal."). The judiciary could not practically consider "any matter" relating to the validity of the project, as urged by Citizens, while still adhering to the expedited schedule.

¶ 40 Finally, the Validation Act sets forth procedures and a burden of proof that expedite validation. The Act permits a district court to "enjoin the commencement, prosecu-

will, statute, resolution, ordinance, lease, indenture, contract, franchise, or other instrument may have an effect on any of the aforementioned, validity also means a declaration of the validity and legality thereof and of rights, status, or other legal relations arising therefrom.
UTAH CODE § 11-30-2(9).

4. The Legislature amended sections 11-30-7, 11-30-8, and 11-30-10 of the Validation Act in 2012.

tion, or maintenance of any other action involving the validity of the bonds," or to consolidate "all other actions or proceedings . . . with the validation proceeding pending before [it]." *Id.* § 11-30-8(1) (2011). And it precludes appeal of these orders. *Id.* § 11-30-8(b). Similarly, the Act forecloses claims that an individual validation proceeding did not comply with the Act, unless "the deficiency renders the proceeding . . . unconstitutional." *Id.* § 11-30-12. Next, section 11-30-9 requires a district court to declare bonds valid unless the court finds "substantial defects or material errors and omissions in the issuance of the bonds."

■ ¶ 41 In summary, the Validation Act establishes a statutory framework for speedy disposition of bond validation petitions. This structure necessarily requires that bond validation proceedings focus on the validity of the bonds as financial instruments rather than on the validity of the project for which the bonds are to be issued. The limited focus of the other enumerated categories in section 11-30-2(9) bolsters this conclusion. Accordingly, we reject Citizens' claim that a validation proceeding is the appropriate vehicle for raising any and all challenges to the project for which the bonds are being issued, including environmental, land use, and zoning issues.[5] Rather, we hold that validation proceedings are narrow and focus on the governing body's authority to issue the bonds, the legality of the proceedings relating specifically to bond issuance, and the validity of the bonds as financial instruments.

## II. THE RESTORATION NETWORK FAILED TO PRESERVE ITS CLAIM THAT NOTICE OF THE VALIDATION HEARING VIOLATED SECTION 11-30-5 OF THE UTAH CODE

### A. *Standard of Review*

■ ¶ 42 Whether the Appellants received proper statutory notice presents "a question of law, which this court reviews for correctness." *Save Beaver Cnty. v. Beaver Cnty.*, 2009 UT 8, ¶ 9, 203 P.3d 937. However, we give "deference to the facts on which the lower court's decision was based." *Id.*

### B. *Preservation*

¶ 43 On appeal, the Restoration Network argues that there is no evidence that the *Commercial Record* has 200 or more subscribers within the boundaries of the city, which the Restoration Network argues is required by the Utah Code. *See* UTAH CODE § 11-30-5(1)(a)(i) (requiring notice to be published "in a newspaper published or of general circulation within the boundaries of the [city]") and UTAH CODE § 45-1-1 (classifying a newspaper of general circulation as one with at least 200 subscribers statewide). The City responds that the Restoration Network failed to preserve this statutory argument in the district court and fails to identify an applicable exception to the preservation rule.

¶ 44 While the Restoration Network's brief claims that publication in the *Commercial Record* does not satisfy section 11-30-5 of the UTAH CODE, its counsel conceded at oral argument that this argument was not preserved below. Our independent review of the record confirms that the Restoration Network had several opportunities to preserve this argument, but did not.[6]

■ ¶ 45 The Restoration Network nevertheless urges us to exercise our discretion and examine this issue because parties who do not receive adequate statutory notice will not know the statute has been violated and will not be able to bring a lawsuit challenging the violation. We decline to do so. While we have reached unpreserved arguments

---

5. In a related argument, Appellants claim that Resolution No. 12 did not provide valid authorization for the bonds because, at the time of its adoption, the proposed project did not comply with section 10-9a-406 of the Utah Code. Section 10-9a-406 provides that "[a]fter the legislative body has adopted a general plan, no street, park, or other public way, ground, place, or space, no publicly owned building or structure, and no

public utility . . . may be constructed or authorized until and unless it conforms to the current general plan." We hold that questions regarding land use and zoning law fall outside the narrow scope of a validation hearing. Accordingly, we decline to address this issue.

6. Similarly, our review of the record indicates that Citizens did not preserve this argument.

when exceptional circumstances exist or where plain error has occurred, *see supra* ¶ 27, the Restoration Network has failed to explain how its unpreserved argument fits within either of these exceptions. And the Restoration Network does not assert that it was unable to raise the issue because it was, in fact, a party to the district court proceedings. Thus, we decline to address the Restoration Network's claim that the notice ordered by the district court did not comply with the requirements of the Validation Act.[7]

## III. APPELLANTS' DUE PROCESS RIGHT TO NOTICE WAS NOT VIOLATED

¶ 46 The Restoration Network argues that notice of the validation hearing published in the *Commercial Record* and on Utah Legal Notices violated its due process right to notice and did not constitute proper service. As a result, it claims that it was not subject to the personal jurisdiction of the district court.

### A. Standard of Review

¶ 47 "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness. . . . However, because [these questions require] the application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177.

### B. Merits

1. Service by Publication Provided Notice Adequate to Satisfy Due Process

¶ 48 The Fourteenth Amendment states that "[n]o State shall make or enforce any law which shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Procedural due process claims are evaluated under a two-part test. The first question is "whether the [complaining party] has been deprived of a protected interest" in property

or liberty. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). If the court finds deprivation of a protected interest, we consider whether the procedures at issue comply with due process. *Id.*

¶ 49 Under the first prong of our due process analysis, we evaluate whether the validation proceedings deprived the Restoration Network of a protected interest in property or liberty. The City asserts that validation proceedings do not implicate one of the Restoration Network's protected property or liberty interests. The Restoration Network responds that validation proceedings implicate a protected property interest by authorizing increased property taxes and a protected liberty interest by foreclosing future challenges to the validity of the bonds. Because we dispose of this claim under the second prong of our due process analysis, we do not address whether the validation proceedings deprive the Restoration Network of protected property and liberty interests.

¶ 50 We now turn our attention to whether the procedures used in this case complied with due process. The U.S. Supreme Court has emphasized that the process due in an individual case is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Indeed, due process's "flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." *Id.* This court has similarly emphasized the flexibility of due process. *See, e.g., Long v. Ethics & Discipline Comm. of the Utah Supreme Court*, 2011 UT 32, ¶ 29, 256 P.3d 206 ("[D]ue process is flexible and calls for the procedural protections that the given situation demands." (internal quotation marks omitted)); *Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d 581 ("[D]ue process is not a technical conception with a fixed content unrelated to

---

7. The City also argues that the Restoration Network invited the district court's alleged error by failing to object that the notice published in the *Commercial Record* did not comply with section

11-30-5. Having found that the Restoration Network did not adequately preserve its statutory claim, we need not reach the City's invited error argument.

time, place, and circumstances. Instead, due process is flexible and, being based on the concept of fairness, should afford the procedural protections that the given situation demands." (internal quotation marks omitted)). Nevertheless, at a minimum, due process requires "[t]imely and adequate notice and an opportunity to be heard in a meaningful way." *In re Worthen*, 926 P.2d 853, 876 (Utah 1996) (alteration in original) (internal quotation marks omitted).

¶ 51 The Restoration Network raises three challenges to the district court's order publishing notice of the bond validation hearing in the *Commercial Record* and on Utah Legal Notices.[8] First, the Restoration Network argues that due process requires notice by mail, rather than by publication. In the alternative, it claims that to satisfy due process, the district court needed to publish notice in the *Salt Lake Tribune* and the *Deseret News*, instead of in the *Commercial Record*. Third, the Restoration Network argues that, because the notice provided by the district court did not comply with due process, it never received proper service of process and the district court never obtained personal jurisdiction over it. We address each of these arguments below.

 a. Notice of the Bond Validation Proceedings by Publication Satisfies Due Process

¶ 52 The Restoration Network argues that the means most reasonably calculated to inform the public of the validation hearing would be through mailing notice to all taxpayers. The City responds that notice by publication satisfies due process for bond validation proceedings and that requiring notice by mail would be financially burdensome. The Restoration Network counters that notice by mail would not create a financial burden because "the [C]ity routinely sends notices to its citizens as part of its water bills and the additional cost for providing such notice is de minimis compared to the cost of the bonded project and the overall total project budget." We agree with the City and hold that notice by publication was sufficient to satisfy due process.

¶ 53 To evaluate whether notice complied with due process, we use the test articulated in *Mullane v. Central Hanover Bank & Trust Company*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *See Dusenbery v. United States*, 534 U.S. 161, 168, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) ("Since *Mullane* was decided, we have regularly turned to it when confronted with questions regarding the adequacy of the method used to give notice."). According to *Mullane*, notice satisfies due process when it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314, 70 S.Ct. 652. "The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Id.* (citations omitted). Moreover, the means of notice employed must be what "one desirous of actually informing the [defendants] might reasonably adopt." *Id.* at 315, 70 S.Ct. 652.

¶ 54 *Mullane* involved a challenge to the constitutional sufficiency of notice of a proposed judicial settlement of accounts for a common trust fund. *Id.* at 307, 70 S.Ct. 652. During the accounting period, the common trust fund included 113 trusts. *Id.* at 309, 70 S.Ct. 652. The only notice provided to beneficiaries of the judicial settlement was the statutorily required, court-ordered publication of notice in a newspaper for four consecutive weeks. *Id.* at 309–10, 70 S.Ct. 652. The U.S. Supreme Court held that, where the location or interest of a beneficiary is not known, due process permitted notice by publication. *Id.* at 317, 70 S.Ct. 652. But, where the location and interest of a beneficiary is known, due process required, at a minimum, notice by mail. *Id.* at 318, 70 S.Ct. 652.

¶ 55 In its other leading notice cases, the U.S. Supreme Court has also considered private property interests held by individuals or small groups. Those cases involved the adequacy of notice given to a property owner subject to a tax sale, *Jones v. Flowers*, 547 U.S. 220, 223–24, 126 S.Ct. 1708, 164 L.Ed.2d

**8.** Citizens join the Restoration Network's due process arguments.

415 (2006); owners of cash and seized automobiles, *Dusenbery*, 534 U.S. at 163, 122 S.Ct. 694; *Robinson v. Hanrahan*, 409 U.S. 38, 38, 93 S.Ct. 30, 34 L.Ed.2d 47 (1972) (per curiam); creditors of an estate, *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 479, 482, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); a mortgagee, *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 792, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); and tenants living in public housing, *Greene v. Lindsey*, 456 U.S. 444, 445, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982).

¶ 56 Through *Mullane* and its progeny, the Court has developed a framework for evaluating notice claims.[9] The Court balances the "individual interest sought to be protected by the [Due Process Clause]" against the government's interest. *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. It has also considered the likely benefit of additional or substitute means of notice.[10] *See, e.g., Jones*, 547 U.S. at 234–37, 126 S.Ct. 1708; *Dusenbery*, 534 U.S. at 170–71, 122 S.Ct. 694; *Mullane*, 339 U.S. at 318, 70 S.Ct. 652. The Court applies these considerations flexibly to the unique circumstances and conditions of each case. *Mullane*, 339 U.S. at 314, 70 S.Ct. 652 (explaining that, what notice is "reasonably calculated ... to apprise interested parties" depends on "all the circumstances" and "the practicalities and peculiarities of the case"); *see also Jones*, 547 U.S. at 227, 126 S.Ct. 1708 ("[T]he notice required will vary with circumstances and conditions." (internal quo-

tation marks omitted)). Moreover, it applies them practically and does not require provision of notice that would be "impossible or impractical."[11] *Mullane*, 339 U.S. at 313–14, 70 S.Ct. 652 (rejecting "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way [of the State]"); *see also Dusenbery*, 534 U.S. at 170 ("But the Due Process Clause does not require ... heroic efforts by the Government; it requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action ....").

¶ 57 The majority of state courts to consider the issue have held that notice by publication for bond validation proceedings satisfies due process. *See, e.g., Jackson v. Waller Indep. Sch. Dist.*, No. 07-3086, 2008 WL 818330, at *7 (S.D.Tex. Mar. 24, 2008) ("Under the circumstances, [notice by publication] was reasonably calculated to inform the [plaintiffs] of the bond-validation action"), *order clarified on other grounds by Jackson v. Waller Indep. Sch. Dist.*, 625 F.Supp.2d 357 (S.D.Tex.2008); *Thomas v. Ala. Mun. Elec. Auth.*, 432 So.2d 470, 477 (Ala.1983) (holding that "service of process by newspaper publication in 'bond validation suits' [has] been upheld by this court against the claim that [publication does] not comport with due process requirements"); *Keys Citizens for Responsible Gov't Inc. v. Fla. Keys Aqueduct Auth.*, 795 So.2d 940, 949–50 (Fla.2001) (hold-

**9.** The U.S. Supreme Court has held that *Mullane*, as opposed to the test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), is generally used to assess notice-based due process claims. *Dusenbery v. United States*, 534 U.S. 161, 167–68, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002). But *Mullane*, as applied by the Court, is notably similar to *Mathews*, which balances the private interest, the government's interest, and the "probable value, if any, of additional ... procedural safeguards." *Mathews*, 424 U.S. at 334–35, 96 S.Ct. 893.

**10.** The dissent regularly cites to the following language from *Mullane*: "[I]n determining the reasonableness of [notice publication, we] ask whether it would satisfy a prudent man of business, counting his pennies but finding it in his interest to convey information to many persons whose names and addresses are in his files." *Mullane*, 339 U.S. at 320, 70 S.Ct. 652. The dissent then extrapolates from this language to

argue that *Mullane* requires a "careful cost-benefit assessment of the reasonableness question." *Infra* ¶ 179. By doing so, the dissent avoids application of the *Mullane* balancing test, which requires courts to consider the individual interest, the government's interest, and the likely benefit of substitute or additional notice when determining the reasonableness of notice. *See supra* ¶ 56. Thus, while a cost-benefit assessment may constitute one component of the reasonableness analysis required by *Mullane*, it is not the sole metric.

**11.** The dissent adopts a formulaic, impractical construction of *Mullane*. It asserts that *Mullane* established "the general rule" and the "minimum requirement" for due process notice. *Infra* ¶¶ 166 n.2, 178. This ignores *Mullane*, its progeny, and general U.S. Supreme Court due process jurisprudence, all of which emphasize that due process is a flexible doctrine to be tailored to the unique circumstances of each case. *See supra* ¶¶ 50, 56.

ing that notice by publication in bond validation proceedings does not violate due process). These courts reason that validation involves a public interest, not a private interest, and a large group of defendants, not the single parties or small groups considered in *Mullane* and its progeny. *Jackson,* 2008 WL 818330, at *8 ("The private property interests at stake in these cases present different due process considerations than the public interest in the bond validation proceeding at issue in this case."); *Thomas,* 432 So.2d at 477 (considering constitutionality of notice by publication for bond validation and holding that "where the class of defendants is so large, no other practicable method of providing adequate notice is available or required").

¶ 58 We find these decisions persuasive because, in "assessing the adequacy of a particular form of notice [the courts] balanc[ed] the 'interest of the State' against 'the individual interest sought to be protected by the Fourteenth Amendment,'" tailored to the unique factual circumstances present in bond validation proceedings. *Jones,* 547 U.S. at 229, 126 S.Ct. 1708 (quoting *Mullane,* 339 U.S. at 314, 70 S.Ct. 652); *see also Thomas,* 432 So.2d at 477 ("[W]here the class of defendants is so large, no other practicable method of providing adequate notice is available or required."); *Keys Citizens,* 795 So.2d at 948 ("As the Supreme Court has explained, due process, unlike some legal rules, is not a technical concept with a fixed content unrelated to time, place and circumstances." (internal quotation marks omitted)); *Jackson,* 2008 WL 818330, at *7 ("The Supreme Court has acknowledged that it is impossible to draw a standard set of specifications as to what is constitutionally adequate notice, to be mechanically applied in every situation." (internal quotation marks omitted)).

¶ 59 The dissent argues that we should instead adopt the minority position, which applies *Mullane* formulaically and holds that notice by publication of bond validation proceedings violates due process. In support of this position, the dissent relies on two Michigan Supreme Court cases. *Alan v. Wayne Cnty.,* 388 Mich. 210, 200 N.W.2d 628 (1972); *Ridenour v. Bay Cnty.,* 366 Mich. 225, 114 N.W.2d 172 (1962). We find these cases unpersuasive. The earlier case, *Ridenour,* does not properly apply *Mullane.* While *Ridenour* cites *Mullane* at length, it treats due process as a formulaic test and reaches its holding without providing any analysis regarding how *Mullane* applies to the unique facts and circumstances of bond validation. *See Ridenour,* 114 N.W.2d at 178–80. Moreover, in *Alan,* the Michigan Supreme Court departed from this formulaic approach to *Mullane.* 200 N.W.2d at 697 ("The kind of notice required depends on the circumstances of the case and the availability of other means in both a theoretical and economic sense."). Thus, we find *Ridenour* unpersuasive.

¶ 60 The second case cited by the dissent, *Alan,* considered the plaintiffs' claim that publication provided inadequate notice of Wayne County's "Notice of Intent to Issue [Revenue] Bonds." 200 N.W.2d at 687, 693–94. By statute, voters could require a referendum on the revenue bonds proposed by Wayne County if, within thirty days of publication of the Notice of Intent, they submitted a petition signed by ten percent of the county's electors. *Id.* at 687. If voters disapproved of the referendum, they would prevent issuance of the bonds and avoid the associated tax increases on Wayne County property owners. *Id.* at 692. Thus, *Alan* is not persuasive here because it was not a bond validation case and it addressed rights of a different nature. For example, unlike *Alan,* the voters here had already approved the Proposition No. 5 bonds and property tax increase.[12] *See supra* ¶ 10.

12. We also note that, while *Alan* found notice by publication of the bond validation proceeding to be unconstitutional, it held that due process did not require notice by mail to all parties. *Alan v. Wayne Cnty.,* 200 N.W.2d 628, 696 (Mich. 1972). Instead, *Alan* suggested that the use of alternative means of notice, such as "full page advertisements; television; radio; or [a] combination of any of the above" would provide notice sufficient to satisfy due process. *Id.* at 697. We think the notice provided here approximates the notice that *Alan* contemplated. Defendants received statutory notice through publication in the *Commercial Record.* And they also received statutory notice through postings on Utah Legal Notices. Additionally, the defendants received notice through extrastatutory sources, including public meetings and emails sent to the Restoration Net-

**(i) The *Mullane* balancing test permits notice by publication under the unique facts of this case**

¶ 61 To determine whether *Mullane* permits notice by publication in this case, we must balance the individuals' interest, the government's interest, and the likely value of additional or substitute notice. We apply *Mullane* flexibly and practically based on the unique facts and circumstances present in this case. *Mullane*, 339 U.S. at 314, 70 S.Ct. 652 ("The Court has not committed itself to any formula achieving a balance between these interests in a particular proceeding or determining when constructive notice may be utilized or what test it must meet."). Accordingly, we hold that *Mullane* permits notice by publication in this case because the large group of defendants shares a narrow public interest, the government has an interest in issuing the bonds approved by voters, and additional notice, like mail, would provide no additional benefit to the defendants.[13]

¶ 62 We first consider "the individual interest sought to be protected by the [Due Process Clause]." 339 U.S. at 314, 70 S.Ct. 652. The nature of the interest held by each of the potential defendants here is nominal and public. The defendants' interests are circumscribed by the scope of the validation proceedings. And the validation proceedings are narrow and focus on the governing body's authority to issue the bonds, the legality of the proceedings relating specifically to bond issuance, and the validity of the bonds as financial instruments. *Supra* ¶ 41. The

Restoration Network cannot challenge the validity of the bond election because the time period for doing so has lapsed. *See* UTAH CODE § 11-14-208; *id.* § 20A-4-403(3)(a). Because of its narrow focus, this validation proceeding implicates only public rights shared in common by the extremely large group of defendants.[14] *See Jackson*, 2008 WL 818330, at *8. It thus differs from *Mullane* and other cases that required notice by mail because those cases addressed individual, private rights to money and to real property. *See id.* ("The[ ] cases requiring individual mail notice involve private rights to money and to real property. The private property interests at stake in these cases present different due process considerations than the public interest in the bond validation proceeding at issue in this case." (citations omitted)).

¶ 63 In addition, the validation proceeding involves an extremely large group of defendants. The Validation Act requires that the City's validation petition name as defendants

all taxpayers, property owners, citizens of the public body, including nonresidents owning property or subject to taxation therein, all other persons having or claiming any right, title, or interest in any property or funds affected by or to be affected by the bonds, all parties to any contract or instrument which is part of the validation proceedings, and, pursuant to Section 11-30-6, either the attorney general or the county attorney of the county in which the

work. Taken together, these sources provided a broad spectrum of constitutionally sufficient notice to defendants of the validation proceedings.

**13.** *Mullane* recognized that notice by publication "traditionally has been acceptable" for in rem proceedings when it is supplemental to additional notice that "in itself may reasonably be expected to convey a warning" to owners of private property. 339 U.S. at 316, 70 S.Ct. 652. In acknowledging this "traditional[ ]" exception, *Mullane* did not hold that notice by publication is only acceptable as a supplement to other notice. And we hold that due process permits notice by publication in the unique circumstances presented by bond validation, where a general public interest shared by a large group of defendants is at stake and where the Attorney General inde-

pendently reviews the validation petition. Our holding rests on the balancing test required by *Mullane*; we do not rely on the traditional exception.

**14.** The City's validation petition does not increase the Restoration Network's property taxes. Proposition No. 5 proposed an increase in residential and commercial property taxes to repay the general obligation bonds needed to finance the proposed complex. Voters approved Proposition No. 5 and no voter contested the election within the time specified in section 11-14-208 of the Utah Code. See UTAH CODE § 20A-4-403(3). Voter approval gave the City the right to issue the bonds. Even if unsuccessful, the optional proceedings under the Validation Act, UTAH CODE § 11-30-3(1), would not divest the City of its right to issue the bonds and increase property taxes.

largest expenditure of proceeds of the bonds is expected to be made.

UTAH CODE § 11-30-3(2).

¶ 64 We need not define the precise scope of section 11-30-3(2) today. But we recognize that, at a minimum, section 11-30-3(2) requires the City to name as defendants "all ... property owners," which includes residential, commercial, public, and other landowners. Moreover, the City must name "all ... citizens of the public body ... affected by or to be affected by the bonds." This certainly includes all citizens who live in the vicinity of the complex. The number of defendants in these two categories alone range in the tens or hundreds of thousands.[15] Because of the sheer number of parties who must be named as defendants in this case, publication is the only reasonable method of providing notice. *See Thomas*, 432 So.2d at 477 (considering the constitutionality of notice by publication for bond validation and holding that "where the class of defendants is so large, no other practicable method of providing adequate notice is available or required").

¶ 65 In short, the City's validation petition names an extremely large group of defendants numbering in the tens or hundreds of thousands and these defendants share an undifferentiated public right to challenge bond validity.

¶ 66 *Mullane* next requires consideration of the government's interest. 339 U.S. at 314, 70 S.Ct. 652. The City has several interests in validating the bonds. The City has an interest in issuing the voter-approved Proposition No. 5 bonds and constructing a sports, recreation, and education complex for its citizens. Bond validation also provides a way for the City to ensure the legality of the bonds prior to their issuance. The certainty that accompanies a judgment of validity permits the City to encourage investment in the bonds by showing "that there are down the road no surprises in store for those who in good faith have made investments." *B.L. White v. Gautier Util. Dist. of Jackson Cnty. (In re Validation of $7,800,000 Combined Util. Sys. Revenue Bond)*, 465 So.2d 1003, 1013 (Miss.1985). Similarly, a judgment that the bonds are valid permits the City to manage the timing of bond issuance and avoid elevated interest rates and construction costs. Because of the benefits of validation, the City has a related interest in ensuring a properly noticed and meticulous validation hearing that will validate the bonds and avoid ongoing litigation and appeals.

¶ 67 Finally, our analysis under *Mullane* requires consideration of the value of additional or substitute notice. *See supra* ¶ 56. In this case, the additional notice proposed by the Restoration Network—notice by mail—would provide no additional protection of the defendants' public interests. *Mullane* permitted imperfect notice when individuals shared an identical interest with a larger group because objections by a few group representatives would benefit the entire group. In *Mullane*, the Central Hanover Bank established a common trust fund for 113 trusts pursuant to a state law that permitted "pooling *small* trust estates into one fund for investment administration." 339 U.S. at 308, 70 S.Ct. 652. The Court considered the trust beneficiaries' interests and stated that "[t]his type of trust presupposes a large number of small interests." *Id.* at 319, 70 S.Ct. 652. The Court then explained that "[t]he individual interest does not stand alone but is identical with that of a class. The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries." *Id.* After characterizing the nature of the beneficiaries' interest, the Court stated that "reasonable risks that notice might not actually reach every beneficiary are justifiable," and "notice rea-

---

**15.** The dissent claims that *Mullane* involved a "very large" number of beneficiaries and suggests that the number of beneficiaries is not functionally different from the large group of defendants here. *Infra* ¶ 177. *Mullane* involved a common trust fund established for 113 trusts pursuant to a state law that permitted "pooling *small trust estates* into one fund for investment administration." 339 U.S. at 307–08, 70 S.Ct. 652 (emphasis added). The Court stated that "[t]he record does not show the number ... [of] beneficiaries," but it presumed "they were many." *Id.* But the number of beneficiaries for the "small trust estates" is surely of a different order of magnitude than the tens or hundreds of thousands of defendants in the validation proceeding.

sonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all." *Id.*

¶ 68 The defendants here share a public right to challenge the bonds' validity and have a common interest in ensuring that the bonds comply with Utah law. Because the defendants share a common public interest in the validation proceeding, a few representatives can vindicate the rights of the entire group. As a result, notice by mail that may increase the percentage of defendants who actually receive notice is not required by due process. *See Jones*, 547 U.S. at 225, 126 S.Ct. 1708 ("[D]ue process does not require actual notice."); *Dusenbery*, 534 U.S. at 171, 122 S.Ct. 694 ("[O]ur cases have never required actual notice.").

¶ 69 In addition to not providing any benefit, notice by mail would impose administrative and financial burdens on the City, as compared to notice by publication. Administratively, the City would have to identify each member of the large group of defendants, gather their addresses, and mail notice to them. Notably, the City does not administer property tax records and would have to obtain property owner addresses from Salt Lake County. Completion of these steps would impose additional costs on the City. These are not insurmountable barriers. But our task is not to evaluate whether the City could feasibly mail notice. Rather, we must evaluate what benefit additional or substitute notice may provide. And in doing so, we must bear in mind that due process is a practical, flexible doctrine, not a formulaic one. *See supra* ¶ 56. Thus, we need not quantify the specific number of additional hours required to mail notice or the precise cost increase of mailed notice as compared to notice by publication. Instead, we merely need to acknowledge that notice by mail offers no additional benefits and it imposes some administrative and financial burdens on the City.[16] We factor this information into the *Mullane* balancing test.

¶ 70 We also find it significant that the defendants' interests are protected by the Attorney General's participation in the validation proceedings. The Validation Act requires that the City's validation petition name numerous defendants, including "either the attorney general or the county attorney of the county in which the largest expenditure of proceeds of the bonds is expected to be made." UTAH CODE § 11–30–3(2). Here, the City named the Attorney General. The Validation Act requires that, upon receipt, "the [A]ttorney [G]eneral shall carefully examine the petition." *Id.* § 11–30–6(1). If, after review, the Attorney General believes that the petition is "defective, insufficient, or untrue, or if . . . a reasonable question exists as to the validity of the bonds," then he "shall contest the petition." *Id.* Alternatively, "[i]f neither of those conditions exists or if one or more other parties to the action will . . . competently contest the petition, the [A]ttorney [G]eneral may . . . be dismissed as a defendant." *Id.*

¶ 71 In this case, the Attorney General reviewed the City's petition in detail and elected not to contest the bonds' validity. The Attorney General testified that two attorneys "spent many, many hours . . . read[ing] everything that [had] been provided both by [the City] and [the Restoration Network]." The Attorney General submitted a memorandum to the district court, explaining his investigation and conclusions. At trial, he testified that "we have simply not found anything that would indicate that either the proceedings or the notices or anything else are invalid or deficient in any manner." The Attorney General also noted

---

**16.** The Restoration Network alleges that the cost associated with notice by mail could be eliminated by pairing the notice with an existing mailing, like water bills. Doing so would diminish the effectiveness of notice by mail. The person who receives the water bill may not be the property owner. For instance, in multifamily dwelling units, like condominiums, water bills are often paid by a manager or homeowners' association. The record property owners never see the water bill and would therefore not receive notice. Additionally, utility customers cannot be expected to anticipate notice of litigation related to an entirely different subject matter—the validity of the proposed bonds—in their water bill. Thus, notice sent with a water bill carries a high risk of being ignored by utility customers. For these reasons, notice mailed with utility bills may be of little or no value.

that other parties could competently contest the petition. The Attorney General's role parallels the role of the defendants and both parties scrutinize the bonds' validity.

¶ 72 In applying *Mullane* to this case, we hold that notice by publication properly apprised defendants of the validation proceedings. Moreover, notice by mail, as requested by the Restoration Network, is unnecessary. The defendants have a nominal, public interest in ensuring the bonds' validity. But vindication of these interests may be accomplished by several representative defendants. Moreover, participation by the Attorney General in the validation proceedings ensures representation of the defendants' public interests. Accordingly, notice by publication of bond validation proceedings is reasonably certain to notify the defendants and it complies with due process.

 (ii) Notice by publication would be permitted in a class action with factual circumstances similar to this validation proceeding

¶ 73 Class actions provide an instructive example for evaluating whether the notice provided in this bond validation proceeding satisfied due process. And our review of class actions shows that notice by publication would satisfy rule 23 of the Federal Rules of Civil Procedure for a class action with factual circumstances similar to the validation proceedings.

¶ 74 Rule 23(b) designates three types of class actions. First, rule 23 permits class actions when "inconsistent or varying adjudications with respect to individual class members . . . would establish incompatible standards of conduct for the party opposing the class," or when "adjudications with respect to individual class members . . . would substantially impair or impede [the ability of other class members] to protect their interests." FED.R.CIV.P. 23(b)(1)(A)-(B). Second, rule 23 permits class actions when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.* 23(b)(2). Third, a class action is permissible when

"questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* 23(b)(3).

¶ 75 While this is not a class action, the bond validation proceedings in this case are most similar to the type of class action identified under rule 23(b)(1). Rule 23(b)(1) permits class actions when "inconsistent or varying adjudications . . . would establish incompatible standards of conduct for the party opposing the class." *Id.* 23(b)(1)(A). Indeed, when discussing rule 23(b)(1), the Advisory Committee Notes contemplated cases similar to this one. The Notes state, "[t]o illustrate: Separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it . . . might create a risk of inconsistent or varying determinations . . . . Actions by or against a class provide a ready and fair means of achieving unitary adjudication." FED.R.CIV.P. 23 Advisory Committee's Notes; *see also Jackson,* 2008 WL 818330, *8-9. We also note that a judgment for class actions under rule 23(b)(1) binds all class members. 7AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1775 (3d ed. 2012). Likewise, a judgment upholding the validity of the bonds binds all defendants in this case. UTAH CODE § 11-30-11(1) ("If the judgment upholds the validity of the bonds, . . . the judgment shall . . . be binding and conclusive as to the validity of the bonds against the public body issuing the bonds and all other parties to the petition . . . .").

¶ 76 For classes designated under rule 23(b)(1), "[a] court may direct appropriate notice to the class." FED.R.CIV.P. 23(c)(2)(A). A court has discretion to select the method of giving notice. FED.R.CIV.P. 23 Advisory Committee Notes. The Advisory Committee Notes offer courts some guidance in selecting a method of notice. The Notes acknowledge that *perfect notice is not necessary* and that, instead, "[n]otice calculated to reach a significant number of class members often will protect the interests of all." FED. R.CIV.P. 23 Advisory Committee Notes; 7B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1786 (3d ed.

2012) ("[I]n suits under subdivisions (b)(1) or (b)(2) ... it is reasonably certain that the named representatives will protect the absent members and give them the functional equivalent of a day in court.").[17] Additionally, the Notes state that courts "should consider the costs of notice in relation to the probable reach of inexpensive methods [of notice]." FED.R.CIV.P. 23 Advisory Committee Note. The "inexpensive methods" referred to may include informal methods of notice. *Id.* For example, "[a] simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice." *Id.* In fact, a court, under appropriate circumstances, has discretion to provide no notice at all in a rule 23(b)(1) or (b)(2) class action. *See, e.g., Keene v. United States,* 81 F.R.D. 653, 658 (S.D.W.Va.1979) ("[T]he better view is that there is no constitutional requirement of notice to members of the class in (b)(1) or (b)(2) actions." (internal quotation marks omitted)); 7AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1793 (3d ed. 2012) ("A court may decide that other factors outweigh the need to give notice."). Publication provides one permissible method of providing notice within the court's broad range of discretion. *Jackson,* 2008 WL 818330, *9 (collecting cases). That notice by publication is permissible in the class action context bolsters our conclusion that the publication notice provided in this case satisfied due process.

¶ 77 The dissent argues, without differentiating among the types of class actions identified in rule 23, that individualized notice is required "[e]ven in cases involving millions of claimants with low-value claims." *Infra* ¶ 180. But the authority cited by the dissent addresses rule 23(b)(3) class actions. Under rule 23(b)(3), "questions of law or fact common to class members" must "predominate over any questions affecting only individual members." In other words, a rule 23(b)(3) class is joined by common legal or factual issues, but its members also have individual

claims, like damages, that may vary among members. *See* 7AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1778 (3d ed. 2012). Because rule 23(b)(3) classes are less cohesive than rule 23(b)(1) classes, rule 23 provides them with additional procedural protections. *See id.* § 1786 (3d ed.2012). Notably, rule 23(b)(3) class members may opt out of the class. *See* FED. R.CIV.P. 23(c)(3)(B). The claims and procedures used in rule 23(b)(3) class actions differ from the validation proceedings. The Validation Act permits defendants to pursue shared, public claims challenging the validity of the Proposition No. 5 bonds. It does not permit them to present individual causes of action. Moreover, the Validation Act does not permit the defendants to opt out of a validation proceeding to pursue individual recourse. *See* UTAH CODE § 11-30-3(2). Thus, a rule 23(b)(3) class action differs from the validation proceedings.

¶ 78 Rule 23 provides another procedural protection to rule 23(b)(3) class members. It states that a court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." FED.R.CIV.P. 23(c)(2)(B). This provides the basis for the dissent's claim that class actions require individualized notice. But the notice requirements for rule 23(b)(3) class actions have no bearing on this case. The defendants in this case are most similar to a class under rule 23(b)(1) and bear little resemblance to a rule 23(b)(3) class. And even if both rule 23(b)(1) and 23(b)(3) could apply in this case, the discretionary notice requirement of rule 23(c)(2)(A), not the mandatory, individual notice requirement of rule 23(c)(2)(B), would still apply. 7AA CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1772 (3d ed. 2012) ("Since the class members in a Rule 23(b)(3) action are given the option not to be included in the judgment, it has been held that Rule 23(b)(1) should control when both provisions apply."); *id.*

---

**17.** Here, the Attorney General fulfills a role analogous to that of a class representative in the class action setting. Under the Validation Act, the Attorney General was statutorily required to protect the defendants' interests and assess the

bonds' validity. *See supra* ¶ 70. In doing so, he reviewed the City's petition in detail, submitted a memorandum to the district court explaining his investigation and conclusions, and testified at trial. *Supra* ¶ 71.

§ 1784.1 (same). Moreover, the notice requirement for rule 23(b)(3) actions is more stringent than the reasonableness standard set forth in *Mullane*. *Franks v. Kroger Co.,* 649 F.2d 1216, 1222 (6th Cir.1981) ("The *Mullane* decision established a constitutional standard of 'reasonable notice,' but this constitutional standard should not be confused with the more rigorous rule of individual notice which the Supreme Court found required by Rule 23 in *Eisen v. Carlisle & Jacqueline*." (internal quotation marks omitted)). Thus, rule 23(b)(3) does not provide an analog to the notice required under *Mullane*.

(iii) *Richards* and *Jackson Construction,* two cases relied on by the dissent, do not assist our resolution of this case

¶ 79 The dissent claims that the following two cases contradict our conclusion that due process permits notice by publication for this bond validation proceeding: *Richards v. Jefferson County,* 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) and *Jackson Construction Co. v. Marrs,* 2004 UT 89, 100 P.3d 1211. We disagree. Both *Richards* and *Jackson* present factual circumstances that differ materially from this case.

¶ 80 In *Richards*, petitioners challenged the constitutional validity of a county occupation tax. 517 U.S. at 794–95, 116 S.Ct. 1761. The petitioners represented a class of all nonfederal employees subject to the occupation tax. *Id.* at 795, 116 S.Ct. 1761. The Alabama Supreme Court held that petitioners' lawsuit was precluded by an adjudication of the tax in a prior action brought by the acting director of finance for the City of Birmingham and three county taxpayers. *Id.* at 796, 116 S.Ct. 1761. The U.S. Supreme Court reversed, holding that the prior action could not preclude the current constitutional claims "[b]ecause petitioners received neither notice of, *nor sufficient repre-*

*sentation in,* [the prior action]." *Id.* at 805, 116 S.Ct. 1761 (emphasis added).

¶ 81 *Richards* differs from this case in several significant ways. First, the Court held that the three county taxpayers did not provide representation of the petitioners in the prior action because they did not assert any claims on behalf of nonparties and the judgment did not bind any nonparties. *Id.* at 801, 116 S.Ct. 1761. But here the defendants are parties to the validation proceeding, UTAH CODE § 11-30-3(2), and the judgment binds them whether or not they participate, *id.* §§ 11-30-3(2), 11-30-11(1). Second, the court concluded that the city of Birmingham's finance director "did not purport to represent the pecuniary interests of *county* taxpayers like petitioners." *Richards,* 517 U.S. at 801–02, 116 S.Ct. 1761. Here, because the defendants share a public interest, a few representatives may vindicate the interests of the larger group. Moreover, the Validation Act directs the Attorney General to "carefully examine the petition and, if the petition is believed to be defective, insufficient, or untrue, or if, in the Attorney General's opinion, a reasonable question exists as to the validity of the bonds, the Attorney General shall contest the petition." UTAH CODE § 11-30-6(1). Thus, the Attorney General examines precisely the same issues that the defendants may challenge and he must contest the petition if a "reasonable question exists as to the validity of the bonds." [18] Due to these differences, *Richards* does not influence our conclusion that representative defendants may vindicate the public interest shared by the large group of defendants to the validation proceeding.

¶ 82 The dissent also argues that

although the *Richards* court recognized that "the States have wide latitude to establish procedures not only to limit the number of judicial proceedings that may be entertained but also to determine

---

**18.** The dissent asserts that the Attorney General "bow[ed] out [of the validation proceedings] after a preliminary determination that he saw no obvious defect in the City's petition." *Infra* ¶ 188. The record contradicts this claim. Prior to the validation hearing, the attorney general filed a memorandum with the district court that explained that he saw no defect in the Proposition No. 5 bonds. The Attorney General also appeared at the validation hearing and testified that he spent "many hours" going over "everything" provided by the City and the Restoration Network, that he specifically considered the objections raised by the Restoration Network, and that he found no defects with the bonds.

whether to accord a taxpayer any standing at all," it went on to hold that once a state elects to recognize a taxpayer claim, it must afford the same notice to that claim as it grants to any other claimant.

*Infra* ¶ 189 (quoting 517 U.S. at 803, 116 S.Ct. 1761). The dissent concludes that claimants, once recognized, are entitled to "full due process rights to notice" and the requirements of the due process rights do not vary based on the nature of the right at issue. *Infra* ¶¶ 189–90. The dissent's argument is not supported by *Richards. See* 517 U.S. at 803–04, 116 S.Ct. 1761. While *Richards* requires that taxpayers receive a "practicable opportunity to contest a tax on federal constitutional grounds," it makes no statement regarding what notice the constitution requires when a state has recognized a taxpayer claim. *Id.* The dissent, by referring to "full due process rights to notice" that do not vary among cases, continues to treat due process as a formulaic doctrine. But due process is a flexible, practical doctrine, the requirements of which vary with the facts of each case. *See supra* ¶ 56.

¶ 83 The dissent claims that a second case, *Jackson Construction*, forecloses the conclusion we reach today. But that case also involved substantially different factual circumstances. In *Jackson Construction*, we considered "whether Jackson Construction's attempts to locate Douglas and Robert [Marrs] met the reasonable diligence standard required for service by publication" under rule 4 of the Utah Rules of Civil Procedure. 2004 UT 89, ¶ 18, 100 P.3d 1211. Rule 4 permits service by publication in the following three circumstances: "[1] the identity or whereabouts of the person to be served are unknown and cannot be ascertained through reasonable diligence, [2] where service upon all of the individual parties is impracticable under the circumstances, or [3] where ... the person to be served is avoiding service of process." UTAH R. CIV. P. 4(d)(4)(A). In *Jackson Construction*, we noted that the first, "reasonable diligence" circumstance in rule 4 "arises from constitutional due process rights" and that due process requires " 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action.' " 2004 UT 89,

¶¶ 11, 14, 100 P.3d 1211 (quoting *Mullane,* 339 U.S. at 314, 70 S.Ct. 652). We held that a single letter to the Marrs's last known address in California did not constitute "reasonable diligence" under rule 4. *Id.* ¶ 21.

¶ 84 *Jackson Construction* is relevant to this case to the limited extent that we recognized that due process is a flexible test and requires notice "reasonabl[e] under all the circumstances" of a particular case. *See id.* ¶ 22 (internal quotation marks omitted). In other words, due process is not a fixed concept to be applied formulaically across different factual circumstances. Beyond this similarity, *Jackson Construction* does not guide our decision in this case. First, *Jackson Construction* applies rule 4, but the Validation Act substituted its own procedures for service of process that supersede rule 4. *Infra* ¶ 98. Second, *Jackson Construction* did not consider the second circumstance under rule 4, which permits service by publication "where service upon all of the individual parties is impracticable under the circumstances." UTAH R. CIV. P. 4(d)(4)(A). If the Validation Act had not provided substitute procedures, this second circumstance would be essential to our analysis of whether service by publication satisfied rule 4's requirements. Third, *Jackson Construction* and this case have fundamentally different facts. *Jackson Construction* involved the real property rights of two people: Douglas and Robert Marrs. This case involves the limited public right of tens or hundreds of thousands of taxpayers to challenge the validity of the Proposition No. 5 bonds. Because the reasonableness of notice depends on the facts of an individual case and the facts of *Jackson Construction* differ significantly from this case, *Jackson Construction* does not inform our decision.

b. Notice by Publication in the *Commercial Record* and on Utah Legal Notices Satisfied Due Process

¶ 85 The Restoration Network claims that, even if due process permits notice by publication of validation proceedings, the notice provided in the *Commercial Record* and on Utah Legal Notices "was not reasonably calculated, under the circumstances, to provide

notification to all interested parties." Instead, the Restoration Network argues that due process required the "substitute procedural safeguard" of publication in the *Salt Lake Tribune* and the *Deseret News* to reasonably inform those affected by the validation proceedings. The City responds that both the *Salt Lake Tribune* and the *Deseret News* published articles, in print and on their websites, about the upcoming validation hearing. The City acknowledges that the articles did not provide formal, legal notice. It concludes, however, that publication in the legal notice section of those newspapers, in addition to the published articles, would not have provided any meaningful additional notice.

¶ 86 To assess whether notice published in the *Commercial Record* and on Utah Legal Notices satisfied due process, we again apply the *Mullane* test, balancing the individual's interest, the government's interest, and the likely benefit of additional or substitute notice. 339 U.S. at 314, 318, 70 S.Ct. 652. The private and government interests at issue are the same as those discussed above. That is, each individual defendant has a nominal, public interest in challenging the bonds' validity. *See supra* ¶¶ 61–65. The City's governmental interest is to encourage investment in the bonds by having them validated and to construct the recreational facility approved by voters in 2003. *Supra* ¶ 66. Thus, we focus our analysis on the likely benefit of the substitute notice—publication in the *Salt Lake Tribune* and/or the *Deseret News*—proposed by the Restoration Network. Because publication in the *Commercial Record* and on Utah Legal Notices, along with notice provided through extra statutory sources, provides the notice required by due process, additional publication in the *Salt Lake Tribune* and/or the *Deseret News* is not required.

¶ 87 The Validation Act directs that the district court, "[u]pon the filing of the [validation] petition," shall "issue an order in the form of a notice against all defendants" that a validation hearing will be held. UTAH CODE § 11-30-4. The clerk of the court must then publish notice of the validation hearing "once each week for three consecutive weeks . . . in a newspaper published or of general circulation within the boundaries of the public body." *Id.* § 11-30-5(1)(a)(i). To qualify as having "general circulation," a newspaper must, among other things, have "a bona fide subscription list of not less than 200 subscribers in this state, and shall have been published for not less than 18 months." *Id.* § 45-1-201.

¶ 88 Here, the district court selected the *Commercial Record* as the newspaper for publication of notice. The *Commercial Record* is regularly used to publish public notices and other court records within Salt Lake County. The district court took judicial notice that the *Commercial Record* has more than the statutorily required 200 subscribers. Next, the court noted that the newspaper is "very widely read in the legal community and the Salt Lake County Bar has over 4,000 members." It also held that the notice "activated the community grapevine resulting in notice spreading even more widely than to those who read" the *Commercial Record*. Ultimately, the court concluded that publication in the *Commercial Record* satisfied the requirement in section 11–30–5.[19]

¶ 89 The Validation Act also requires that notice of the validation hearing be published on Utah Legal Notices for three weeks. *See id.* § 11–30–5(1). Notice of the validation hearing was properly published on Utah Legal Notices. Digital notice provided on Utah Legal Notices improves the likelihood that citizens will receive legal notice by providing a convenient, readily available alternative to traditional, print notice. *See* Lauren A. Rieders, *Old Principles, New Technology, and the Future of Notice in Newspapers*, 38 HOFSTRA L.REV. 1009, 1039 (2010) ("The Internet will not only improve the chance citizens will receive notices when they are published in the public domain, but in some ways it can make certain that those who wish to receive notice will in fact receive it."); *see also Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017 (9th Cir.2002)

---

**19.** On appeal, the Restoration Network challenges whether publication in the *Commercial Record* complied with section 11-30-5. It failed, however, to preserve this challenge. *Supra* ¶¶ 44–45.

("Courts ... cannot be blind to changes and advances in technology. No longer do we live in a world where communications are conducted solely by mail carried by fast sailing clipper ... ships.... No longer must process be mailed to a defendant's door when he can receive complete notice at an electronic terminal inside his very office ...." (first and second alterations in original) (internal quotation marks omitted)). For instance, the public may review Utah Legal Notices using the internet service provided at public libraries or other public locations. The Legislature's decision to publish notice in both traditional print and digital media formats represents a forward thinking choice that maximizes the availability of legal notice to citizens. *See Rieders, supra* at 1041 ("Utah's public notice law provides an excellent paradigm for the publication of legal notices.").

¶ 90 The Restoration Network contends that statutory compliance is not enough to satisfy due process. Rather, it argues that the district court needed to publish notice in "the newspaper with the largest possible readership and audience in Salt Lake City." Specifically, the Restoration Network argues that due process required the district court to publish notice in the *Salt Lake Tribune* and the *Deseret News.* To support its argument, the Restoration Network relies on *Thomas.*

¶ 91 *Thomas* involved the Alabama Municipal Electric Authority's petition to validate Bulk Power Supply Services Revenue Notes. 432 So.2d at 472. At issue was whether the statutory notice requirements for a bond validation proceeding satisfied due process. *Id.* at 477. The relevant statute required notice by publication of the validation proceedings in a newspaper published at least five days per week in the four largest cities in the state. *Id.* The Alabama Supreme Court reviewed the statute under the *Mullane* standard, which requires that "[t]he method of notice chosen must give reasonable assurance of actually giving notice in light of the other available means." *Id.* It concluded that "[t]he Legislature could reasonably determine that notice by publication in newspapers published in the four largest cities of the State[,] was best calculated to apprise the large class of defendants of the commencement of these proceedings." *Id.*

¶ 92 The Restoration Network exaggerates *Thomas*'s holding. While *Thomas* found that notice by publication in newspapers published in Alabama's four largest cities was adequate to satisfy due process, it did not require publication in the largest newspapers within those cities. And it left open the possibility that other forms of notice publication could also satisfy due process. Accordingly, we find the Restoration Network's argument that due process requires publication in the largest newspapers within the governing body's boundary unpersuasive.[20]

¶ 93 It is also relevant that the notice required by section 11-30-5 of the Utah Code was not the only notice Defendants received. Defendants also received notice of the validation proceedings through nonstatutory sources. In determining whether notice satisfies due process, we may consider notice provided in addition to that required by statute.[21] *Keys Citizens,* 795 So.2d at 950. In *Keys Citizens,* the Florida Supreme Court noted that the "County developed a Sanitary Waste Master Plan over the course of three years during which there was extensive public outreach." *Id.* The outreach included "a series of forums and workshops throughout the Florida Keys; meetings between the planning group and various civic, environ-

**20.** The City asserts that news articles published in the *Salt Lake Tribune* and the *Deseret News* adequately substituted for publication of legal notice in those newspapers. Both of the newspapers published news articles about the validation hearing in their print and online editions. The articles were published independently from the district court's order. They describe the City's pursuit of a bond validation petition and identify the February 9, 2011 hearing before District Judge Kate Toomey. But the articles do not iden-

tify details critical to notice, such as the location and time of day for the validation hearing. As a result, they do not provide an adequate substitute for properly published legal notice.

**21.** We acknowledge that these extra statutory sources of notice are not a substitute for compliance with the notice requirements set forth in section 11-30-5 of the Utah Code. But they do inform whether defendants received adequate notice for purposes of due process.

mental, and business groups; and monthly televised public meetings of a citizens' task force on waste water during the last two years of the planning period." *Id.* The court considered this additional public outreach in deciding that the citizens had received the notice required by due process. *Id.*

¶ 94 The Restoration Network and Citizens received notice of the validation hearing beyond that required by section 11-30-5 of the Utah Code when the City provided them with actual notice of the hearing and when the City conducted a series of bond issuance meetings in 2010. First, the City provided direct notice of the validation hearing by email to the Restoration Network. The Restoration Network then distributed this notice to its members. Mr. Raymond Wheeler, one of the Citizens, also received direct notice through a subpoena requiring him to appear at the validation hearing. Second, the City provided notice for a series of meetings in 2010 during which issuance of the bonds was discussed. During a February 9, 2010 meeting, the City authorized issuance of the bonds with Resolution No. 12. The City then held meetings on March 2, 2010, and December 7, 2010, to receive public feedback regarding Resolution No. 12. In advance of these meetings, the City provided public notice by publication in the *Salt Lake Tribune* and the *Deseret News* and on Utah Legal Notices.

¶ 95 We hold that the notice provided by the district court and the City was reasonably calculated to notify defendants of the validation proceedings. The notice may not have been perfect, but due process does not require perfection when, as is the case here, a large number of small interests are at issue. *Mullane,* 339 U.S. at 319, 70 S.Ct. 652. Rather, *Mullane* and its progeny set forth a practical, flexible test for evaluating the constitutional sufficiency of notice. In the unique circumstances of this case, each individual in the large group of defendants shares an undifferentiated public interest in ensuring that the City's bonds are valid. As a practical matter, this public interest may be vindicated by a representative subset of the larger group. *See id.* Thus, due process does not require actual notice to each individ-

ual defendant. The Restoration Network and the other defendants to the validation proceeding received notice in the *Commercial Record,* on Utah Legal Notices, through direct email, and through public meetings. This provided the defendants with reasonable notice of the validation proceedings. Because that notice protected the defendants' due process rights, additional publication in the *Salt Lake Tribune* and/or the *Deseret News* was unnecessary.

 c. Defendants Were Properly Served and Subject to the Personal Jurisdiction of the District Court

¶ 96 The Restoration Network argues that, because the district court failed to provide the notice required by due process, they were not properly served and the district court never acquired personal jurisdiction over them. The City responds that the Restoration Network waived any objection to personal jurisdiction by appearing and participating in the validation hearing. The City also argues that the Restoration Network's receipt of actual notice of the validation proceedings permitted the district court to acquire personal jurisdiction over them.

¶ 97 "Personal jurisdiction ... is the court's ability to exercise its power over a person for the purposes of adjudicating his or her rights and liabilities. A lack of [personal jurisdiction] is fatal to a court's authority to decide a case with respect to a particular litigant." *Jackson Constr.,* 2004 UT 89, ¶ 8, 100 P.3d 1211 (alterations in original) (internal quotation marks omitted). Before a district court acquires personal jurisdiction over a defendant, several requirements must be met, including proper service of process to the defendant. *Id.* ¶ 10.

¶ 98 Generally, rule 4 of the Utah Rules of Civil Procedure governs the procedures required for service of process. But the Validation Act provides its own specific procedures that supersede rule 4. UTAH R. CIV. P. 81(a) ("These rules shall apply to all special statutory proceedings, except insofar as such rules are by their nature clearly inapplicable."). Specifically, the Validation Act provides that, "[u]pon the filing of [a validation] petition, the court shall issue an order in the

form of a notice against all defendants" identifying the time and place of the validation hearing. UTAH CODE § 11-30-4. Upon publication of the district court's notice order, "all defendants shall have been duly served and shall be parties to the proceedings." *Id.* § 11-30-5(3).

¶ 99 The district court complied with the statutory publication requirements of the Validation Act. *Supra* ¶¶ 87–88. Moreover, we conclude that notice by publication, as provided in the *Commercial Record* and on Utah Legal Notices, complies with due process. *Supra* ¶ 95. Because the district court complied with the Validation Act and due process, we hold that all defendants to the validation proceedings received proper service of process. Thus, the district court properly obtained personal jurisdiction over them.[22]

2. Notice by Publication Provided Citizens with Sufficient Time to Prepare a Defense

¶ 100 Citizens argue that the notice provided by the district court's Decorum Order did not provide them adequate time to prepare a defense and thus violated their due process rights. The City replies that the court should not consider this sub-issue because Citizens fail to identify where it was preserved.

¶ 101 The City accurately notes that Citizens violated rule 24(a)(5)(A) by failing to identify where in the record they preserved their claim of inadequate notice. But the argument section of Citizens' opening brief contains citations showing that the claim was in fact preserved. We accordingly exercise our discretion and address the merits of their claim.

¶ 102 Citizens argue that the Decorum Order issued by the district court provided them with inadequate notice of the procedures to be used at the validation hearing and therefore compromised their ability to prepare an adequate defense. In particular, Citizens complain that they were not prepared to testify, examine witnesses, or provide closing argument.

¶ 103 The Validation Act requires that "[u]pon the filing of [a validation] petition," the district court shall "issue an order in the form of a notice" informing all defendants of the time and place of the validation hearing. UTAH CODE § 11-30-4. The Notice Order provided by the district court in this case named as defendants "all taxpayers, property owners and citizens of the City including nonresidents owning property, or subject to taxation therein, all other persons having or claiming any right, title, or interest in any property or funds affected by or to be affected by the Bonds, and the Attorney General." It then outlined the content and consequences of the City's validation petition. Next, the order directed defendants who wished to contest the petition to appear at the validation hearing and "show cause why the prayers of the Petition should not be granted." Finally, the order noted that, upon publication, "all defendants shall have been duly served and shall be parties to the bond validation proceedings." Pursuant to the order, notice appeared in the *Commercial Record* and on Utah Legal Notices.

¶ 104 A February 3, 2011 Decorum Order issued by the district court reiterated the content of the Notice Order. It also specified the procedures for the validation hearing. The Decorum Order provided, inter alia, that the City would receive twenty minutes to present the petition, the Attorney General would receive ten minutes, and all other defendants would receive three minutes each. The core of Citizens' complaint is that the Decorum Order did not provide sufficient notice for them to prepare to testify, examine witnesses, or present closing arguments. But Citizens incorrectly focus on the Decorum Order as the source of notice for the validation hearing. In fact, the source was the district court's Notice Order. Citizens fall within the large group of defendants identified in the court's Notice Order. The order required them to "appear" at the vali-

22. We hold that the district court properly obtained personal jurisdiction over the defendants to the validation proceeding. As a result, we need not address the City's alternative arguments that the Restoration Network waived its personal jurisdiction objection or that the Restoration Network's receipt of actual notice provided a substitute for proper service of process.

dation hearing and "show cause" why the City's validation petition should not be granted. Notice published pursuant to the Notice Order first appeared in the *Commercial Record* and on Utah Legal Notices on January 18, 2011. This provided Citizens with adequate time to prepare for the February 9th validation hearing. Accordingly, we hold that notice of the validation hearing provided to Citizens complied with due process.[23]

## IV. THE VALIDATION HEARING COMPLIED WITH DUE PROCESS BY PROVIDING CITIZENS WITH AN ADEQUATE OPPORTUNITY TO BE HEARD

### A. Standard of Review

¶ 105 Generally, due process issues present questions of law that we review for correctness. *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177. "However, because [these questions require] the application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *Id.*

### B. Preservation

¶ 106 Citizens contend that the district court violated their due process right to be heard through the procedures used at the validation hearing, by not granting a continuance of the hearing, and by excluding evidence submitted after the hearing. The City replies that we should not consider this claim because Citizens failed to identify where it was preserved. The City also asserts that the district court was not aware that Citizens had presented a due process challenge to the hearing procedures.

¶ 107 Citizens did not pair their statement of this issue—that the procedures used at the validation hearing violated their right to be heard—with record citations identifying where they preserved it in the district court. While the record cites they provide do show where the procedures complained of

arose, they do not indicate that Citizens raised any objection to them. Moreover, Citizens do not claim that their inadequate hearing claim falls within one of the exceptions to the preservation rule. Absent an exception, we will not address the merits of a claim that the district court has not first had an opportunity to consider. Because we hold that Citizens did not preserve their inadequate hearing claim, we decline to address it.

¶ 108 Citizens also assert that the district court erroneously failed to grant a continuance of the validation hearing. But prior to closing argument, the district court asked all of the parties if they wanted to postpone closing until another day. Citizens did not request additional time or object to proceeding with closing arguments. Our preservation rule does not permit a party to waive an issue before the district court and later raise the issue on appeal. *See Patterson v. Patterson*, 2011 UT 68, ¶ 16, 266 P.3d 828. Because Citizens failed to preserve their argument that the district court improperly failed to grant them a continuance, we will not consider it.[24]

¶ 109 Finally, Citizens contend that the district court violated their due process right to be heard by refusing to admit evidence submitted after the validation hearing. After the hearing, Mr. Wheeler filed a brief alleging that the district court had violated due process when it decided not to accept new evidence after the validation hearing. Because Mr. Wheeler preserved the claim for appeal, we will address its merits.

### C. Merits

¶ 110 Citizens argue that the district court's decision to exclude evidence submitted after the validation hearing violated their due process rights. We disagree. Citizens received a meaningful opportunity to be heard at the validation hearing. The district court's decision not to permit supplementary evidence after the hearing does not vitiate this conclusion.

---

23. Below, we address whether the hearing procedures employed by the district court complied with due process.

24. Citizens do not claim that their argument qualifies for an exception to the preservation rule.

¶ 111 Due process requires, at a minimum, adequate notice and "an opportunity to be heard in a meaningful manner." *Salt Lake Legal Defender Ass'n v. Atherton*, 2011 UT 58, ¶ 2, 267 P.3d 227. The type of hearing required depends on the circumstances of each case. *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). Typically, a hearing must provide parties the opportunity to present "evidence, objections, and arguments, to the end that the . . . court may be enabled to fairly and intelligently pass upon and determine the questions presented for decision." *McGrew v. Indus. Comm'n*, 96 Utah 203, 85 P.2d 608, 616 (1938) (internal quotation marks omitted).

¶ 112 To properly assess whether the district court's decision not to accept posthearing submissions of evidence complied with due process, we must first address the process provided to the Citizens during the hearing. The district court permitted Citizens to participate extensively. So given the opportunity, Citizens testified. In particular, the district court permitted Mr. Ehrbar to testify regarding potential environmental consequences of the project even though this testimony exceeded the scope of the validation hearing. The district court also gave Citizens the opportunity to cross-examine witnesses. Both Mr. Wheeler and Ms. Knorr took advantage of this opportunity. Finally, the district court permitted Citizens to present closing arguments. Both Mr. Wheeler and Ms. Knorr did so.

¶ 113 At the conclusion of the hearing, the district court stated that the parties could submit a "response" prior to issuance of its decision. Six defendants misinterpreted the district court's statement at the hearing and submitted posthearing letters expressing their intent to supplement the record. The district court subsequently issued a Minute Entry to clarify its statement. It explained that it had "invited written summations, or argument, but [it] did not, and cannot, invite or accept new evidence. Citizens may file what they wish, but the court may only consider argument based on the law, and evidence already in the record." Despite the Minute Entry, several defendants submitted additional evidence, which the district court declined to consider.

¶ 114 The Validation Act permits "[a] defendant [to] file, amend, or supplement any pleading to the [validation] proceeding at any time on or before the hearing." UTAH CODE § 11-30-7(1). But after the hearing, a defendant must obtain permission from the court prior to filing, amending, or supplementing a pleading. *Id.* Thus, the district court acted within its statutory authority when it denied defendants' requests to supplement the evidentiary record. And in doing so, it did not deny Citizens due process. Citizens' participation in the validation hearing, through testimony, cross-examination, and presentation of closing arguments, satisfied due process. The district court's decision not to permit supplementary evidence after the hearing had concluded does not change the fact that Citizens' due process rights had already been satisfied.

## V. THE PROJECT CURRENTLY PROPOSED BY THE CITY DOES NOT MATERIALLY DIFFER FROM THE PROJECT APPROVED BY VOTERS

¶ 115 On appeal, the Restoration Network asks whether the City "may issue bonds to fund a project that . . . is barely half the scope of what voters were told they were funding." The Restoration Network's claim requires that we address two separate questions. First, we must determine whether collateral documents produced by the City and by third parties prior to the bond election create binding terms for the bond project. Second, we must evaluate whether the project the City now intends to implement differs in material ways from the project approved by voters.

### A. Standard of Review

¶ 116 The parties dispute the standard of review applicable to this issue. The Restoration Network argues that the issue presents a question of law to be reviewed for correctness. The City argues that this issue presents a question of fact subject to a clearly erroneous standard of review.

¶ 117 The two questions presented are subject to different standards. The first question, which requires that we determine whether collateral documents create binding terms for a bond project, requires that we review the district court's legal determination that the Pamphlet does not bind the City. We review a district court's legal conclusions for correctness. *T–Mobile USA, Inc. v. Utah State Tax Comm'n*, 2011 UT 28, ¶ 9, 254 P.3d 752.

¶ 118 The second question, which evaluates whether the proposed project materially differs from the project approved by voters, presents a mixed question of fact and law. *See State v. Pena*, 869 P.2d 932, 936 (Utah 1994), *holding modified by State v. Levin*, 2006 UT 50, 144 P.3d 1096 (describing that mixed questions of law and fact require a "determination of whether a given set of facts comes within the reach of a given rule of law"). To answer it, we must compare the project the City presented to voters with the currently proposed project and then make a legal determination whether the two materially differ.

¶ 119 We employ a case specific standard of review for mixed questions of fact and law by balancing the following three factors:

(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a [district] court's application of the legal rule relies on facts observed by the ... judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to [district] courts.

*Levin*, 2006 UT 50, ¶ 25 144 P.3d 1096 (internal quotation marks omitted). These factors allocate discretion "along a spectrum of deference that runs from highly deferential review under a 'clearly erroneous' standard on one end to completely nondeferential review under a 'correctness' standard on the other end." *Id.* ¶ 19. "[O]ur goal in applying the

... balancing test is to allocate tasks between the trial and appellate courts based on their institutional roles and competencies." *Id.* ¶ 31.

¶ 120 Based on our balancing of the three factors, we conclude that the district court's factual determinations with respect to this issue are entitled to only limited deference. First, the question of whether a voter-approved project materially differs from the project proposed for implementation will present a variety of facts that vary depending on the type of bond issued, the elements of the proposed project, and the identity of the issuing authority. The complexity of the facts, however, is limited and only requires comparison of the voter-approved and proposed projects. Second, the legal determination of whether a material difference exists depends on a comparison of the project proposed to voters and the project proposed for implementation. These facts will generally be ascertainable based on a review of the "cold" record, and do not depend on evidence, like witness testimony, that may be uniquely observed by the district judge. And we can identify no policy reasons that weigh for or against granting additional discretion to the district court. Because the facts necessary to make the material difference determination are relatively simple and equally available to appellate and district courts, we accord limited deference to the district court's findings on this issue.

### B. Merits

1. The City Is Only Bound by Statements Made in Statutorily Required Notices

¶ 121 The Restoration Network argues that the Pamphlet and a *Salt Lake Tribune* article published prior to the bond election set forth material terms for the project and that these terms bind the City.[25] The City answers that collateral statements, like the Pamphlet and the article, do not bind it.

¶ 122 "The usual rule is that it is the notice published pursuant to the statute which binds the [City], and that collateral

**25.** Citizens join the Restoration Network's argument regarding whether the Pamphlet is binding and whether the proposed project has materially changed.

statements or explanatory materials do not." *Ricker v. Bd. of Educ.*, 16 Utah 2d 106, 396 P.2d 416, 419 (1964). At the time of the 2003 bond election, section 11-14-3(1)(a) of the Utah Code required that notice of a bond election be published "once a week during three consecutive weeks in a newspaper."[26] But if "the debt service on the bonds to be issued will increase the property tax imposed upon the average value of a residence by an amount that is greater than or equal to $15 per year," additional notice requirements were imposed on the governing body proposing the bonds. UTAH CODE § 11-14-3(2)(a)-(b) (2003). Section 11-14-3 offered several ways to provide the additional notice, including mailing of a voter information pamphlet. *Id.* § 11-14-3(2)(b) (2003).

¶ 123 The Proposition No. 5 bonds did not require a voter information pamphlet or other additional notice. The bonds were predicted to increase the property tax imposed on the average value of a residence by $7.75 per year, which falls below the $15 per year statutory trigger requiring additional publication of a voter information pamphlet.[27] Because the Pamphlet was collateral to the statutorily required notice, the statements made in the Pamphlet did not impose binding requirements on the City.

¶ 124 Despite our rule in *Ricker*, the Restoration Network encourages us to review the Pamphlet, claiming that this court has "often" done so to "determine what voters have approved." In support of its position, the Restoration Network relies on *State v. Willis*, 2004 UT 93, 100 P.3d 1218; *Stavros v. Office of Legislative Research & Gen. Counsel*, 2000 UT 63, 15 P.3d 1013; *In re Young*, 1999 UT 6, 976 P.2d 581; and *State v. Kastanis*, 848 P.2d 673 (Utah 1993).

¶ 125 These cases, which involved initiatives and constitutional amendments,[28] do not undermine our conclusion that the Pamphlet did not impose binding terms upon the City. In each of these cases, the lieutenant governor was statutorily required to issue a voter information pamphlet. *See* UTAH CODE § 20A-7-701(1) ("The lieutenant governor shall cause to be printed a voter information pamphlet ... [regarding] any measure submitted to the voters by the Legislature or by a statewide initiative or referendum petition.");[29] UTAH CONST. art. XXIII, § 1 (stating that the Legislature, after approval of a constitutional amendment, shall submit the amendment "to the electors of the state for their approval or rejection"). In this case, no such statutory requirement exists. According to our decision in *Ricker*, only the material terms of the notice published pursuant to statutory requirements bind the City. *See* 396 P.2d at 419.

¶ 126 Finally, the Restoration Network asserts that the City "admits that it intended for citizens to rely on its representations in the [Pamphlet]" and should thus be bound by them. This claim relies on testimony from Richard Graham, Director of Public Services for the City. When counsel asked if the City

---

**26.** We refer here to sections of the Utah Municipal Bond Act in effect at the time of the 2003 election. *See* UTAH CODE § 11-14-3(1)(a) (2003). The Local Government Bonding Act replaced the Municipal Bond Act in 2005. *See id.* § 11-14-202 (2005).

**27.** The Restoration Network asserts that "because the election presented voters with ballot propositions that would increase property taxes by more than $15 per year, the [C]ity was required to provide the [Pamphlet]." But the Proposition No. 5 bonds were only predicted to raise property taxes by $7.75 per year. Although not explicitly stated in its brief, the Restoration Network may be arguing that section 11-14-3(2) requires a voter information pamphlet to be published if *all* bonds proposed by a governing body in one election would result in a cumulative increase in property taxes of more than $15 per year. If that is the claim, it is inadequately

briefed. Indeed, the Restoration Network provides no legal analysis in support of such an interpretation. We may reject as inadequately briefed arguments that fail to "provide meaningful legal analysis." *W. Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 (internal quotation marks omitted).

**28.** *State v. Willis*, 2004 UT 93, ¶ 15, 100 P.3d 1218; *Stavros v. Office of Legislative Research & Gen. Counsel*, 2000 UT 63, ¶ 24, 15 P.3d 1013; *In re Young*, 1999 UT 6, ¶¶ 20–21, 976 P.2d 581; *State v. Kastanis*, 848 P.2d 673, 675 (Utah 1993).

**29.** Section 20A-7-701 was previously codified in 1976 at section 20-11a-7 of the Utah Code. Thus, the requirement that a voter information pamphlet be published applied to the initiative at issue in *Stavros* and the constitutional amendments at issue in *Willis* and *Kastanis*.

intended for voters to rely on the Pamphlet, Mr. Graham responded that the Pamphlet was "prepared for the public to have information on [the bond] so I believe the answer is yes." In *Ricker*, we stated that

> representations made by [a governing body] or its members should not be regarded as restricting [the body's] prerogative unless it clearly and unequivocally appears that the [governing body] has made a binding commitment or so acted that justice and equity would require it to follow some predetermined course of action.

*Id.* at 420. Mr. Graham's testimony that the City intended the Pamphlet to inform voters does not amount to a clear and unequivocal statement that the City be bound by the Pamphlet's terms and the Restoration Network does not even argue that justice and equity require that the Pamphlet bind the City.

¶ 127 The Restoration Network also asserts that statements made in a *Salt Lake Tribune* article about Proposition No. 5 bind the City.[30] But the article cited by the Restoration Network is an opinion article with authorship attributed to the "*Salt Lake Tribune.*" We refuse to bind the City to statements it did not make.

¶ 128 Under *Ricker*, we hold that neither the Pamphlet nor the *Salt Lake Tribune* article set forth binding terms for the project.[31]

2. The Proposed Project Does not Materially Differ From the Project Approved by Voters

¶ 129 On appeal, the Restoration Network claims that the City provided specific details in the Pamphlet and the *Salt Lake Tribune* article about how the bond proceeds would be used for the project and, in doing so, forfeited any discretion it had to modify the project. The Restoration Network then argues that the project the City now seeks to implement is materially different than the one approved by voters. In particular, the Restoration Network asserts that the project now proposed has fewer athletic fields, is located in a smaller area, has no education component, and will cost more. Citizens present similar arguments.

¶ 130 The City replies that neither Proposition No. 5 nor the Pamphlet set forth the type and number of fields to be constructed at the complex. In the alternative, the City contends that project details, including the number and type of fields to be constructed, fall within its discretion.

¶ 131 The Legislature has granted the City plenary power to develop parks and associated facilities. UTAH CODE § 10–8–8 ("A municipal legislative body may lay out, establish, open, alter . . . or otherwise improve . . . parks . . . [or] public grounds . . . ."); *see also id.* § 10-8-5 ("[The municipality] may erect all needful buildings for the use of the city, and provide for their care."). The City may issue bonds in furtherance of its park building authority. *Id.* § 10-8-1 ("[The] city councils of cities shall have the power to control the finances and property of the corporation."); *id.* § 10-8-6 ("[The municipality] may borrow money on the credit of the corporation for corporate purposes in the manner and to the extent allowed by the Constitution and the laws, and issue warrants and bonds therefor in such amounts

---

**30.** The Restoration Network relies on *Devorsky v. La Vega Independent School District*, 635 S.W.2d 904 (Tex.App.1982), *abrogation recognized by Taxpayers for Sensible Priorities v. City of Dallas*, 79 S.W.3d 670 (Tex.App.2002). In *Devorsky*, the Texas Court of Appeals found that the appellant stated a valid cause of action by alleging that school board members made unofficial statements that "expressly represented to the voters that the bond proceeds would be used to purchase a specifically designated site" and then "arbitrarily abandoned the represented site and selected another site." *Id.* at 908. But recent Texas decisions have rejected this portion of *Devorsky* and declined to consider extraneous documents or representations. *See Taxpayers for Sen-*

*sible Priorities*, 79 S.W.3d at 676 (holding that "representations, outside of official orders or resolutions," do not bind a municipality). Accordingly, we find *Devorsky* unpersuasive. Moreover, *Taxpayers for Sensible Priorities* is consistent with *Ricker*, where we held that only notice published pursuant to statute binds the City. *See* 396 P.2d at 419.

**31.** Because we hold that the Pamphlet and the *Salt Lake Tribune* article do not bind the City, we need not address the City's argument that the two documents were not properly admitted into evidence.

and forms and on such conditions as they shall determine."). To exercise its authority, the City "must necessarily be allowed a reasonable latitude of judgment and discretion." *Gardner v. Davis Cnty.*, 523 P.2d 865, 867 (Utah 1974); *Ricker*, 396 P.2d at 420 ("It is the policy of the law not to favor limitations on the powers of the administrative body, but rather to give it a free hand to function within the sphere of its responsibilities.").

¶ 132 Once voters approve a bond, the City has discretion in disposing of the proceeds and implementing the approved project. *See Ricker*, 396 P.2d at 420; *see also Gardner*, 523 P.2d at 867 (holding that the Municipal Bond Act's wording "clearly denotes a discretionary power"). The City's discretion includes "some flexibility in planning for contingencies and adapting to changes in circumstances." *Gardner*, 523 P.2d at 867; *Busse v. City of Golden*, 73 P.3d 660, 666 (Colo.2003) (en banc) ("Although a city may not materially depart from an approved purpose, we have never so narrowly limited municipalities to prohibit expenditures for uses that are necessary and incidental to that purpose."). The City's discretion is not, of course, limitless. Voters may

challenge the City's use of bond proceeds on the grounds that (1) the City exceeded the scope of its statutory or constitutional authority; (2) the City acted arbitrarily and capriciously; or (3) the City engaged in "deceit, fraud or corruption." *Ricker*, 396 P.2d at 420–21. This limited judicial role conforms to our general reluctance "to intrude into the functions of other branches of government." [32] *Id.* at 421.

¶ 133 The Restoration Network does not argue, under *Ricker*'s second ground, that the City acted arbitrarily or capriciously or, under *Ricker*'s third ground, that the City acted deceptively. And the district court specifically found that the City did not make deceptive or misleading statements to voters. As a result, we need not analyze these grounds.

¶ 134 We focus our analysis on whether the project, as currently proposed, exceeds the scope of the City's statutory or constitutional authority. The Utah Constitution provides that money borrowed by the City "shall be used solely for the purpose specified in the law authorizing the loan." [33] UTAH CONST. art. XIV, § 5. But a bond's

---

32. In the absence of a legal remedy, voters may seek recourse through the political process. A voter may "vote for and elect officials he thinks [are] best qualified to represent his interests." *Ricker*, 396 P.2d at 420. And if the elected officials fail to meet the voter's expectations, he may seek redress at the ballot box. *Id.* Further, if voters "believe an unwise course is being followed," they may petition for further hearings on the matter. *Id.*

33. The Restoration Network cites a number of cases to support the proposition that the City may not implement a project with a different purpose than the one approved by voters. *See Sacks v. City of Oakland*, 190 Cal.App.4th 1070, 120 Cal.Rptr.3d 1, 16 (Cal.Ct.App.2010) (holding that the city acted within the voter-approved purpose of a bond when it exercised its discretion to assign veteran officers to neighborhood beat positions and used bond revenue to recruit, hire, and train new officers); *McNichols v. City & Cnty. of Denver ex rel. Newton*, 209 P.2d 910, 913–14 (Colo.1949) (en banc) (holding that use of bond proceeds to construct a Bureau of Public Welfare building materially departs from the voter-approved purpose of improving Denver General Hospital); *Pine v. Baker*, 76 Okla. 62, 184 P. 445, 451 (1919)(In re Road Consr., Okmulgee Cnty.), (holding that bonds approved for construction of permanent roads "could not be used

simply for grading the roads, when it is admitted the funds available are insufficient to pave the same after the grading has been done"); *Devorsky*, 635 S.W.2d at 908 (considering a motion to dismiss and holding that plaintiff stated a valid cause of action by asserting that school board members expressly represented to voters that bond proceeds would be used to construct a school at a specific site and then arbitrarily changed the project's location); *Thompson v. Pierce Cnty.*, 113 Wash. 237, 193 P. 706, 707 (1920) (concluding that a proposal to construct a new road materially departed from the proposal to improve an existing road that was submitted to voters); *Haws v. Cnty. Court of Wayne Cnty.*, 86 W.Va. 650, 104 S.E. 119, 121 (1920) (holding that construction of a road between Kenova and Wayne must follow "the nearest and most direct practicable route," and other alignments deviated from the purpose approved by voters). The City adds a similar case. *Lewis v. City of Fort Worth*, 126 Tex. 458, 89 S.W.2d 975, 978 (1936) (holding that conducting "shows, rodeos, fairs, expositions, and other amusements . . . is in harmony with the general purposes of pleasure grounds, parks, and playgrounds"). These cases comport with Utah's constitutional requirement that bonds shall only be used for the purpose for which they are authorized. UTAH CONST. art. XIV, § 5. Beyond this similarity, none of the cases

purpose may be stated in general, not specific, terms. UTAH CODE § 11-14-2(3)(c) (2003) ("The purpose may be stated in general terms and need not specify the particular projects for which the bonds are to be issued or the specific amount of bond proceeds to be expended for each project."); *Id.* § 11-14-10(1) (2003) ("[T]he proposition ... shall include a statement ... in general terms [of] the purpose for which [the bonds] are to be issued."). Nevertheless, a governing body exceeds the scope of its constitutional authority if it uses bond proceeds in a manner materially different from the uses approved by voters. *See Busse*, 73 P.3d at 666.

¶ 135 The Restoration Network argues that the currently proposed complex differs materially from the complex approved by voters because it includes fewer athletic fields, no education component, and is smaller in size, though it costs approximately the same. Specifically, the Restoration Network claims that "[t]he [C]ity represented [to voters] that the bonds would fund an athletic complex containing 30 soccer fields, 2 rugby fields, 8 baseball fields, and an indoor facility." It complains that the City now "proposes to construct only 16 multi-use fields, no baseball fields, and no indoor facility." But the language of Proposition No. 5 contained no such quantitative commitments.

▪ ¶ 136 Proposition No. 5's stated purpose was to "pay[ ] the costs of acquiring, constructing, furnishing and equipping a multi-purpose regional sports, recreation and education complex and related roads, parking and improvements." In fact, even the Pamphlet, which does not bind the City, *supra* ¶ 123, did not quantify the number of athletic fields. The source of the City's purported commitment to construct a certain number of fields is the article published in the *Salt Lake Tribune*,[34] which is neither attributable to, nor binding on, the City. In short, the City made only a binding commitment to construct "a multi-purpose regional sports [and] recreation ... complex." The City has discretion to conclude that construction of 16 multi-use fields serves this purpose. In so doing, it has not materially departed from the commitment it made to voters.

¶ 137 Next, the Restoration Network and Citizens both claim that the currently proposed project lacks an education component. In particular, Citizens argue that the City committed to, but no longer intends to, build an "education complex." Again, Citizens' argument is not supported by the actual language of Proposition No. 5. The proposition stated only that its purpose is to construct a "multi-purpose regional sports, recreation and education complex and related roads, parking and improvements." And while this language requires the City to construct a complex that includes sports, recreation, and education components, the district court found that the proposed project does so. The record, and testimony from the validation hearing, support this finding. The Regional Athletic Complex Riparian Restoration Plan provides for installation of interpretive signage that will "provide education opportunities and help foster environmental stewardship through better understanding of the ecology of the Jordan River." And Mayor Ralph Becker testified that the athletic activities provided at the complex inherently provide educational benefits. The City has discretion in incorporating "sports, recreation and education" into the broader "multi-purpose regional ... complex." By providing education through interpretive signs and athletic activities, the proposed project is consistent with the project presented to voters.

¶ 138 The Restoration Network also complains that "the [C]ity proposed to build a 212-acre complex and now plans to build a 160-acre complex." But the language of Proposition No. 5 did not commit to building a complex of a fixed area. Thus, the area of the proposed complex does not materially depart from the terms of Proposition No. 5.

¶ 139 Finally, the Restoration Network argues that taxpayers will have to incur significant additional costs before the City can

---

cited provide factually analogous circumstances that would guide our decision in this case.

**34.** The Restoration Network also cites an August 17, 2010 memorandum prepared by the City in support of its claim that the City made quantitative commitments to voters regarding the number of fields it planned to build. The memorandum states that the original scope of the project, "as presented to voters[,] included 25 Soccer/Multi-use fields and 8 Baseball/Softball fields." Even though the City authored this memorandum, it came years after the bond election and does not provide contemporaneous evidence of what the City represented to voters.

provide a complex comparable to the one advertised to voters. The Restoration Network's claim presumes that the proposed complex provides a smaller area and fewer athletic fields than the City promised to voters. But, as discussed above, Proposition No. 5 did not make any quantitative commitments.

¶ 140 The Restoration Network presents two additional arguments. First, it claims that the City must strictly comply with the terms of the bond resolution and that this obligation strips it of any discretion in implementing the project. In support of its argument that the City must strictly comply with the terms in the bond resolution, the Restoration Network cites *Committee for Responsible Sch. Expansion v. Hermosa Beach City Sch. Dist.*, 142 Cal.App.4th 1178, 48 Cal. Rptr.3d 705, 714 (2006) (permitting use of bond proceeds to construct a gymnasium because the bond resolution expressly stated that the proceeds would be used in such a manner); *State ex rel. Traeger v. Carleton*, 242 Minn. 296, 64 N.W.2d 776, 778–79 (1954) (holding that a village had "no discretionary power to change the authority [granted by voters], except possibly in minor details which do not affect the nature of the plan voted upon"); and *Tukey v. City of Omaha*, 54 Neb. 370, 74 N.W. 613, 615 (1898) ("[W]hen the governing body of a municipality is authorized by a vote of the people, and only thereby, to incur a debt for a particular purpose, such purpose must be strictly complied with, and the terms of the authority granted be strictly and fully pursued . . . ."). But the Restoration Network's position conflicts with the rule we set forth in *Gardner*, which grants governing bodies "some flexibility in planning for contingencies and adapting to changes in circumstances." 523 P.2d at 867. We therefore decline to accept it.

¶ 141 Second, the Restoration Network contends that the City may not provide spe-cific project details to obtain voter approval only to change the project after the bond election. In so arguing, it relies on two cases where courts concluded that specific details included in a bond proposition constrained the discretion of the issuing authority. *See O'Farrell v. Sonoma Cnty.*, 189 Cal. 343, 208 P. 117, 119 (1922) (holding that identification of road length and designation of beginning and ending points for the road eliminated the issuing county's discretion to build only a portion of the road); *Marteeny v. Louth*, 197 Ill.App. 106, 113, 115 (1915) (holding that a bond proposition that proposed construction of specific road segments at a cost of $40,000 eliminated the highway commissioner's discretion to select more expensive construction materials and build only a portion of the road segments). But *O'Farrell* and *Marteeny* are not analogous to this case because the language of Proposition No. 5 did not include specific project details.[35] In particular, Proposition No. 5 did not quantify either the number or type of fields proposed for the complex.

¶ 142 In summary, we hold that the proposed complex does not materially differ from the project proposed to voters because it includes an education component and because Proposition No. 5 did not make quantitative commitments regarding the number of athletic fields or the area of the athletic complex.

## VI. RESOLUTION NO. 12 PROVIDED PROPER AUTHORIZATION TO IS-SUE THE BONDS AND TO FILE A VALIDATION PETITION; THE RES-TORATION NETWORK FAILED TO PRESERVE ITS ARGUMENT THAT THE CITY DID NOT HOLD A TIME-LY SECTION 318 HEARING

### A. Standard of Review

¶ 143 "We review questions of statutory interpretation for correctness, affording no

---

**35.** We find *O'Farrell v. Sonoma Cnty.*, 189 Cal. 343, 208 P. 117 (1922) and *Whitner v. Woodruff*, 68 Fla. 465, 67 So. 110 (1914), another case cited by the Restoration Network, unpersuasive on independent grounds. Both cases applied the contract theory of bonding, which treats the bonds as a binding contract between the issuing authority and voters. *O'Farrell*, 208 P. at 119 (holding that a contract between voters and the issuing county precluded the county from build-ing a portion of a road proposed in the bond resolution approved by voters); *Whitner*, 67 So. at 111 (applying the contract theory of bonding and holding that county commissioners lacked discretion to change the width of a road, or its cost, after voter approval and bond issuance). The contract theory of bonding directly conflicts with Utah's rule, which permits governing bodies some discretion when implementing bond projects. *Supra* ¶¶ 131–32.

deference to the district court's legal conclusions." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 (internal quotation marks omitted).

### B. Preservation

¶ 144 The Restoration Network argues that the City failed to comply with the Bonding Act in two ways. First, the Restoration Network claims that Resolution No. 12 did not provide final authorization for the bonds and therefore could not be used as the basis for the City's validation petition. Citizens echo this argument. Second, the Restoration Network asserts that the City failed to hold the hearing required by section 11–14–318 of the Utah Code prior to approving Resolution No. 12. The City contends that the Restoration Network failed to preserve these arguments. The Restoration Network's opening brief anticipated the City's position and argues, in the alternative, that we can reach the section 318 issue under the plain error doctrine.

■ ¶ 145 The Restoration Network properly preserved its argument that Resolution No. 12 is not a final authorization, but it failed to preserve its argument that the Bonding Act required the City to hold a section 318 hearing prior to adoption of Resolution No. 12. The Restoration Network respondent's brief, filed before the validation hearing, specifically stated that Resolution No. 12 "does not fully authorize the issuance of the Bond." The Restoration Network claims that it preserved its argument that the City failed to hold a timely section 318 hearing and provides two citations to the record. But neither of the citations support the Restoration Network's position. First, the Restoration Network cites to its respondent's brief. As noted, the brief challenges the finality of Resolution No. 12. It also claims that the notice published by the City in advance of a March 2, 2010 hearing failed to comply with section 318. But the Restoration Network did not raise the claim that the City failed to hold a timely section 318 hearing. To the extent that the Restoration Network did raise the claim, its argument was "so cryptic and vague that [it] did not satisfy the [preservation rule's] specificity require-

ment." *State v. Winfield*, 2006 UT 4, ¶ 27, 128 P.3d 1171.

■ ¶ 146 The Restoration Network argues that it also preserved its claim regarding the timeliness of the hearing in its Objection to Revised Proposed Order of Judgment. There, the Restoration Network challenged the City's proposed language stating that the March 2, 2010 hearing satisfied section 318. But the basis for the Restoration Network's objection was that the City's proposed language exceeded the scope of the district court's conclusions of law. It therefore asked the district court to instead include a statement that only the notice provided for the March 2nd hearing satisfied section 318. The district court adopted the Restoration Network's proposed modification. But the district court's acceptance of the modified language does not support the inference that the Restoration Network challenged the timing of the section 318 hearing. Because neither of the record citations identified by the Restoration Network raise the claim that the City failed to hold a timely section 318 hearing, we conclude that the argument was not preserved.

■ ¶ 147 Although it was not properly preserved, the Restoration Network asks us to review its argument under the plain error exception to the preservation rule. To succeed under the plain error exception, a party "must demonstrate that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 17, 266 P.3d 671 (internal quotation marks omitted).

¶ 148 We first turn our attention to whether the error alleged by the Restoration Network should have been obvious to the [district] court. The disputed portion of section 318 reads as follows:

(1) Before issuing bonds authorized under this chapter, a local political subdivision shall:

· · ·

(b) hold a public hearing:

(i) if an election is required under this chapter:

(A) no sooner than 30 days before the day on which the notice of election is published under Section 11–14–202; and

(B) no later than five business days

before the day on which the notice of election is published under Section 11–14–202; *and*

(ii) to receive input from the public with respect to:

(A) the issuance of the bonds; and

(B) the potential economic impact that the improvement, facility, or property for which the bonds pay all or part of the cost will have on the private sector.

UTAH CODE § 11-14-318(1)(b) (emphasis added).

¶ 149 The proper timing of a section 318 hearing presents an issue of first impression. The Restoration Network asserts that the public hearing required by the Bonding Act must occur prior to authorization of the bonds. The City replies that the Bonding Act permits the hearing to be held after adoption of a resolution authorizing bonds. Both the Restoration Network and the City read subsections (1)(b)(i) and (1)(b)(ii) independently. They then focus their analysis on subsection (1)(b)(ii) and disregard subsection (1)(b)(i). Based on this approach, both parties conclude that section 318 requires a public hearing sometime after the bond election, but before delivery of the bonds. The parties dispute only whether the hearing must occur before bond authorization.

¶ 150 Neither party acknowledges a third, equally plausible reading of section 318, which is that the required hearing must be held prior to the bond election. Section 318 states only that the hearing be held "[b]efore issuing bonds authorized under this chapter." *Id.* § 11-14-318(1). And there is no reason to read the statute as requiring public hearings both before and after the election authorizing the bonds. Indeed, the statute requires "a public hearing" in the singular. Moreover, this interpretation is supported by the structure of subsection (1)(b)(i) and (1)(b)(ii), which are joined by the conjunctive term "and". The two subsections, read together, provide the timing and content for a single hearing that is to be held prior to the bond election.[36]

¶ 151 Because the appropriate time for a section 318 hearing presents a question of first impression that is susceptible to multiple plausible interpretations, we hold that the error alleged by the Restoration Network could not have been obvious to the district court. Because the second element of the plain error test is not satisfied, we hold that the Restoration Network's section 318 claim does not qualify for the plain error exception to our preservation rule and we decline to address the claim on its merits.

### C. Merits

1. Resolution No. 12 Properly Authorized Issuance of the Proposition No. 5 Bonds

¶ 152 We now turn to the merits of the Restoration Network's preserved claim that Resolution No. 12 did not provide final authorization for bond issuance. Specifically, the Restoration Network argues that the district court could not validate the bonds based on a nonfinal resolution that allowed the City to modify material terms of the bonds. Citizens present a similar argument.

¶ 153 The City maintains that Resolution No. 12 fully authorized issuance of the bonds. Resolution No. 12 states, "[t]he City Council hereby authorizes and approves the issuance and sale of the Bonds, pursuant to the provisions of this Resolution and the Final Bond Resolution." The district court held that "the sequence followed [by the City] is legal, and practically necessary to effectuate the bond sale" and that Resolution No. 12 pro-

---

36. This alternative interpretation is further supported by the legislative history of the bill. In 2008, the Legislature passed Senate Bill 32, which added section 318 to the Bonding Act. S.B. 32, 57th Leg., Gen. Sess. (Utah 2008). Senator Scott K. Jenkins sponsored the bill. *Id.* Speaking before the Senate, he stated, "Second Substitute Senate Bill requires municipalities and counties to have hearings prior to bondings and requires them, at those hearings, to speak of the potential economic impact that the improvement, facility, or property that the bond … will have on the private sector." RECORDING OF UTAH SENATE FLOOR DEBATES, S.B. 32, Second Substitute, 57th Leg., Gen. Sess. (Feb. 1, 2008) (statement of Sen. Jenkins).

vided authorization sufficient to file a bond validation petition. We agree with the district court.

¶ 154 The Bonding Act requires that, prior to issuance, a bond shall "be authorized by resolution of the governing body." UTAH CODE § 11-14-302(1) (2009).[37] The City "authorize[d] the issuance and sale" of the Proposition No. 5 bonds with Resolution No. 12, which was adopted February 9, 2010. Resolution No. 12 did not purport to provide the final terms necessary for bond delivery. Rather, it stated that these terms would be fixed by a "Final Bond Resolution" to be adopted by the City at a later date. The City attached the Final Bond Resolution to Resolution No. 12 in "substantially final form." The Final Bond Resolution included the following incomplete terms: the principal of the bonds, the interest rate, the date of maturity, the date when payments commence, the number of bidders for the bonds, and the successful bid and bidder. Some of these terms, like the name of the successful bidder, could not be completed until sale of the bonds. And Resolution No. 12 constrains the others. Specifically, it identifies a maximum principal, interest rate, time to maturity, and discount from par.[38]

¶ 155 The Restoration Network complains that the City will be able to materially change the terms of the bond prior to issuance, but after validation. In particular, the Restoration Network claims that the City could increase the amount of the bond or change its purpose. But this is not the case. Both Resolution No. 12 and the Final Bond Resolution fix the amount of the bond and its purpose. These terms are not subject to later modification.

¶ 156 Citizens also argue that, because Resolution No. 12 is not a valid bond authorization, the City's validation petition was invalid. The Validation Act requires that the petition reference "the ordinance, resolution, or other proceedings by which the public

body authorized the issuance and delivery of the bonds." UTAH CODE § 11-30-3(3)(c). And the validation petition complied with this requirement by referencing Resolution No. 12 as authorizing issuance of the Proposition No. 5 bonds. Because we affirm the district court's holding that Resolution No. 12 properly authorized issuance of the bonds, the City could properly rely on Resolution No. 12 as the basis for its validation petition.

¶ 157 Citizens make a final argument that the City failed to properly publish notice of its intent to issue bonds on Utah Legal Notices, as required by section 11-14-316 of the Utah Code. In support of this argument, they offer the affidavit of Kirk Simmons, the Chief Financial Officer of Newspaper Agency Company, LLC, who asserts that the City failed to publish notice of intent to issue bonds in the Utah Legal Notices on February 13, 2010. But the record contains a February 13, 2010 order confirmation for publication of notice of bond issuance in the *Salt Lake Tribune*, *Deseret News*, and on Utah Legal Notices. Absent some foundation for Mr. Simmons's assertion, it is insufficient to contradict the proof of publication offered by the City.

¶ 158 In summary, we agree with the district court that "[t]he sequence followed here is legal, and practically necessary to effectuate the bond sale." Resolution No. 12 provides significant constraints on the Final Bond Resolution. These constraints eliminate the Restoration Network's concern that the City may adopt material changes to Resolution No. 12 after validation. And some flexibility is a practical necessity for the City. It would be impractical to require the City to fix the applicable interest rate before validation because actual sale and delivery of the bonds may not occur for several weeks or months.

---

37. The City passed Resolution No. 12 on February 9, 2010. At that time, the 2009 version of the Bonding Act governed passage of the Resolution. *See* UTAH CODE § 11-14-302(1) (2009).

38. Resolution No. 12 specifies "an aggregate principal amount not to exceed $15,300,000, to bear interest at a rate or rates of not to exceed eight percent (8.00%) per annum, to mature over a period not to exceed twenty (20) years from their date or dates, and to be sold at a discount from par, expressed as a percentage of principal amount, of not to exceed two percent (2.00%)."

## VII. THE DISTRICT COURT DID NOT ERR WHEN IT STATED THAT "THIS BOND VALIDATION ACTION IS NOT EVEN A CLOSE CASE"

¶ 159 In their final claim of error, Citizens assert that the district court "erred in making the sweeping conclusion that the bond validation action was not even a close case." But they fail to tie their claim to any assertion of legal error. In its conclusions of law, the district court stated that "[t]he [c]ourt concludes that this bond validation action is not even a close case." This statement has no legal effect and therefore does not provide a legitimate basis for challenging the district court's legal rulings.

### CONCLUSION

¶ 160 The district court properly granted the City's petition to validate the Proposition No. 5 bonds. The validation proceedings conducted by the district court protected Appellants' due process rights to notice and to be heard. Notice by publication in the *Commercial Record* and on Utah Legal Notices provided Appellants with proper notice of the validation hearing. And Appellants had a meaningful opportunity to participate at the hearing. They testified, examined witnesses, and presented closing arguments.

¶ 161 The district court also correctly applied the Validation Act and the Bonding Act. It accurately concluded that the Validation Act provides a narrowly focused, expedited procedure. Similarly, the district court correctly held that the project now proposed is consistent with what the City advertised to voters prior to the election. Finally, the district court properly determined that the constraints set on material terms in Resolution No. 12 permitted the resolution to authorize the bonds and serve as the basis for the validation petition. For these reasons, we affirm the district court's grant of the City's validation petition.

Justice PARRISH authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, and Justice DURHAM joined.

Justice LEE filed a dissenting opinion.

Justice LEE, dissenting:

¶ 162 I respectfully dissent because the publication notice provided to the taxpayer respondents in this case seems to me to fall far short under the due process standard articulated in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *Mullane* unequivocally requires first-class mail notice (or its equivalent) before a judgment can extinguish a claim belonging to known claimants. Mere publication is categorically insufficient as a primary form of notice for known claimants under the Due Process Clause. It withstands constitutional scrutiny only as a supplement to individual notice or for claimants whose identity or location is unknown. Because the notice employed in this case accordingly falls short, I would reverse and remand to allow the case to be relitigated after notice that conforms to the requirements of due process.

¶ 163 The court's conception of due process cannot stand under a proper understanding of the *Mullane* decision. Its various attempts to distinguish or supersede that decision are unpersuasive, moreover, on both legal and factual grounds. Thus, I view the court's opinion today as establishing a novel and dangerous precedent—one that justifies publication as a primary form of notice in cases involving large numbers of claimants asserting "public" claims. I acknowledge that approach has carried the day in a handful of decisions in other states upholding bond validation proceedings like that before us here. But those decisions are also incompatible with binding precedent from the U.S. Supreme Court, and they accordingly provide no viable cover for the court's decision here. For me, the only persuasive precedents that are directly on point are two decisions from the Michigan Supreme Court—both striking down publication notice in a bond validation context under a careful application of *Mullane*. I would follow those cases, not the contrary decisions cited by the majority.

¶ 164 Although I share the majority's discomfort with the result sought by the plaintiffs—reopening a bond validation matter long after the issuance of the bond—that

result is the inevitable consequence of the decision by our legislature to recognize a private right of action in this area. The legislature could avoid that result by altering the legislative scheme to assign the right to sue to a representative litigant. But so long as our law recognizes a private right of action, that right likewise carries a right to constitutionally sufficient, individualized notice. I accordingly dissent.

## I

¶ 165 Under *Mullane* and its progeny, publication is a constitutionally deficient means of providing notice to claimants whose interests and whereabouts are known. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315–19, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[1] As a general rule, publication is upheld as a constitutionally sufficient form of the notice essential to due process only in limited circumstances—as a "supplement[]" to "customary" forms of notice or as "substitute" service "in the case of persons missing or unknown." *Id.* at 316–18, 70 S.Ct. 652. Thus, in *Mullane* the court endorsed the use of publication notice for claimants (beneficiaries of a common trust fund) "whose interests or whereabouts could not with due diligence be ascertained," noting that traditional notice could not reasonably be required as to unknown claimants in light of the "practical difficulties and costs that would be attendant on frequent investigations into the status of great numbers of beneficiaries." *Id.* at 317, 70 S.Ct. 652. And while acknowledging the

"risk[ ] that notice might not actually reach every beneficiary," the court held that the requirements of due process were nonetheless satisfied. *Id.* at 319, 70 S.Ct. 652. Specifically, the court explained that in the case of a trust involving a "large number of small interests," service on known claimants would effectively "safeguard the interests of all" given that all trust claimants' interests were essentially "identical." *Id.*

¶ 166 Yet, although the *Mullane* Court endorsed publication notice for unknown claimants, it unequivocally repudiated it for those whose interests and whereabouts were well known. As to those claimants, the court expressly found "no tenable ground for dispensing with a serious effort to inform them personally of [their right to assert their claims], at least by ordinary mail to the record addresses." *Id.* at 318, 70 S.Ct. 652. More to the point, the court specifically held that publication fell short of the requirements of the Due Process Clause when it was directed at claimants with a known interest and address. In the court's words, publication notice "to known beneficiaries is inadequate, not because in fact it fails to reach everyone, but because under the circumstances it is not reasonably calculated to reach those who could easily be informed by other means at hand."[2] *Id.* at 319, 70 S.Ct. 652.

¶ 167 Thus, as for known trust beneficiaries, *Mullane* held that publication notice was inadequate and that first-class mail was

---

1. See also 4A Charles Alan Wright & Arthur R. Miller Federal Practice and Procedure § 1074 (3d ed. 2012) ("Publication ordinarily is not a proper means of service in actions based on in personam jurisdiction. Perhaps the only general context in which service by publication will be sufficient is when it is used to serve an absent domiciliary who cannot be served in any other way." (footnote omitted)); 16D C.J.S. *Constitutional Law* § 1761 ("[D]ue process requires that notice be given by mail or some other method equally certain to insure actual notice, rather than publication, to persons who are known or reasonably ascertainable, since notice by publication is not sufficient with respect to a person whose name and address are known or easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." (footnotes omitted) (citing *In re Estate of Anderson*, 821 P.2d 1169 (Utah 1991)).

2. The court misses the essence of *Mullane* in broadly asserting that "imperfect notice" is sufficient in circumstances involving "individuals [who] share[ ] an identical interest with a larger group," while insisting generally that "notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all." *Supra* ¶ 67 (internal quotation marks omitted). This confuses the general rule (of individual notice by mail or its equivalent) with the rationale for its exception (of publication for claimants of unknown identity or location). Contrary to the majority's representation, *Mullane* nowhere endorses notice to fewer than all known claimants on the ground that others will "safeguard the interests of all." Instead, it simply explains that a failure to notify unknown claimants is defensible in circumstances where claimants who receive notice have representative claims. 339 U.S. at 316–319, 70 S.Ct. 652.

the constitutional minimum. *Id.* (noting that "[h]owever it may have been in former times, the mails today are recognized as an efficient and inexpensive means of communication"). As a further explanation of the due process standard, the *Mullane* Court made reference to the standards of the "business world," noting that "[i]n some situations the law requires greater precautions in its proceedings than the business world accepts for its own purposes," while "[i]n few, if any, will it be satisfied with less." *Id.* at 319–20, 70 S.Ct. 652. Thus, under *Mullane*, "it is instructive, in determining the reasonableness of the impersonal broadcast notification here used, to ask whether it would satisfy a prudent man of business, counting his pennies but finding it in his interest to convey information to many persons whose names and addresses are in his files." *Id.* at 320, 70 S.Ct. 652. Under this standard, the court had no trouble rejecting publication as the form of notice for known beneficiaries. As the *Mullane* Court noted, "[p]ublication may theoretically be available for all the world to see, but it is too much in our day to suppose that each or any individual beneficiary does or could examine all that is published to see if something may be tucked away in it that affects his property interests." *Id.*

¶ 168 Accordingly, the *Mullane* Court unequivocally held that publication notice was "incompatible with the requirements of the Fourteenth Amendment as a basis for … depriving known persons whose whereabouts are also known" of a right to assert a claim against the trustee for mismanagement of the trust. *Id.* In so doing, the court noted that "the trust company ha[d] been able to give mailed notice to known beneficiaries," both "at the time the common trust fund was established," *id.* at 319, 70 S.Ct. 652, and upon "periodically remit[ting] income" to beneficiaries, *id.* at 318, 70 S.Ct. 652. In light of these facts—which confirmed that "postal notification … would not seriously

burden the plan," *id.* at 319, 70 S.Ct. 652— the court held that such notice was the constitutional minimum for known beneficiaries and that publication notice was insufficient. *Id.* at 320, 70 S.Ct. 652. For known claimants, in fact, the court was "unable to regard" publication "as more than a feint," concluding that "[i]t would be idle to pretend that publication alone … is a reliable means of acquainting interested parties of the fact that their rights are before the courts." *Id.* at 315, 70 S.Ct. 652.

¶ 169 Our own precedents confirm this construction of *Mullane*. In *Jackson Construction Co. v. Marrs*, 2004 UT 89, 100 P.3d 1211, we cited *Mullane* for the proposition that "publication alone is generally" insufficient and is upheld only as a last-resort alternative to individual service after "reasonably diligent efforts to locate the party to be served." *Id.* ¶ 11 (citing *Mullane*, 339 U.S. at 315, 70 S.Ct. 652). Specifically, our *Jackson* opinion held that the "reasonable diligence" required by due process is not satisfied by the use of publication notice in the wake of "perfunctory" attempts to locate and individually serve defendants. *Id.* ¶ 19. Instead, we held that a plaintiff seeking service by publication must first "take advantage of readily available sources of relevant information"—e.g., "by checking telephone directories and public records, contacting former neighbors, or engaging in other actions suggested by the particular circumstances of the case" or by utilizing "[a]dvances in technology, such as the Internet," which "have made even nationwide searches for known individuals relatively quick and inexpensive." *Id.* ¶ 20. Thus, reiterating *Mullane*, our *Jackson* opinion concluded that before a plaintiff can resort to notice by publication, it "must take advantage of reasonably available channels of relevant information as suggested by ordinary prudence and the particular circumstances of the case." *Id.* ¶ 24.[3]

---

**3.** Notwithstanding the court's various attempts to distance itself from *Jackson Construction*, that decision is on point and irreconcilable with the result in this case. Granted, the *Jackson Construction* case arose out of factual circumstances different from those presented here; and it involved the notice requirements of rule 4 and not those of the Validation Act. *See supra* ¶¶ 83–84.

But that changes nothing, as in both cases the core question concerns the constitutional limits of due process. In both instances our answer should be the same: mere publication is categorically insufficient as a primary form of notice for known claimants under the Due Process Clause; it withstands constitutional scrutiny only as a

¶ 170 *Mullane* and *Jackson* unequivocally foreclose the majority's decision in this case. Under this precedent, the Due Process Clause cannot be construed to endorse the use of publication as the primary, sole means of notice of suit. I would reverse and remand under the authority of this precedent—particularly *Mullane*, a binding decision that we have no authority to disregard.

¶ 171 The court's principal response to *Mullane* amounts to an impermissible end-run around it. Although the majority gives an obligatory nod to *Mullane* as the controlling precedent, *supra* ¶ 56 n. 9, it then articulates a "balancing test" to be applied "flexibly to the unique circumstances and conditions of each case," *supra* ¶ 56 & n. 10. In so doing, it effectively jettisons the *Mullane* standard and substitutes in its place an alternative due process formulation drawn from *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Supra* ¶ 56 & n. 9. This flexible *Mathews* standard "balances the private interest, the government's interest, and the probable value, if any, of additional ... procedural safeguards." *Supra* ¶ 56 n. 9 (alteration in original) (internal quotation marks omitted).

¶ 172 The problem is that *Mullane* leaves no room for "balancing" away the core right of litigants to individual notice of the prospect of the loss of their right of action in a judgment against them. Instead, for claimants whose identity and location is known, *Mullane* unmistakably establishes a due process floor—a right to notice on par with that provided by first-class mail.

¶ 173 The court's pivot away from *Mullane* and toward *Mathews* purports to be a subtle one. But it is significant. In applying a flexible "balancing" test in its decision, the court is eschewing *Mullane* in favor of *Math-*

*ews.* And that move is clearly foreclosed by U.S. Supreme Court precedent.

¶ 174 The controlling precedent here is *Dusenbery v. United States*, 534 U.S. 161, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002). Although the court purports to follow that decision, *supra* ¶¶ 53, 56 n. 9, the majority's standard is expressly precluded by it. The petitioner in *Dusenbery* proposed a standard in line with that adopted by our court today: It sought to incorporate the *Mathews* balancing test (weighing the private and government interests and assessing the value of additional procedures) into the due process notice standard. Brief for Petitioner at 9, *Dusenbery v. United States*, 534 U.S. 161, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (No. 00–6567). The *Dusenbery* Court conclusively rejected that standard. 534 U.S. at 167, 122 S.Ct. 694. It held that "*Mullane* supplies the appropriate analytical framework," concluded that there was "no reason to depart from th[e] well-settled" standard in that decision, and conclusively rejected the *Mathews*-based balancing test proposed by the petitioner. *Id.* at 167–68, 122 S.Ct. 694.

¶ 175 That decision thoroughly quashes the balancing test applied by the court today. After *Dusenbery*, we are not at liberty to interject *Mathews*-based balancing into our evaluation of the notice required under the Due Process Clause. I respectfully dissent from the majority's end-run around *Mullane* and its effective disregard for *Dusenbery*. Those cases unequivocally foreclose the flexible balancing employed by the court today and require a reversal for the reasons explained above.[4]

## II

¶ 176 The court makes various attempts to justify a contrary conclusion, but none are compatible with *Mullane* and its U.S. Su-

---

supplement to individual notice or for claimants whose identity or location is unknown.

4. For these same reasons, I take no umbrage in the court's repeated charge that my approach is "formulaic" in its adoption of *Mullane*. *Supra* ¶¶ 56 n.11, 59, 82. The *Mullane* opinion does, in fact, set forth a "formula" for assessing notice under the Due Process Clause. The snippet from *Mullane* cited by the majority, *see supra* ¶ 61, is not to the contrary. In context, the *Mullane*

Court's statement that the court had not committed itself to any definitive "formula," *supra* ¶ 61, is clearly a characterization of the state of the law prior to *Mullane*. Before *Mullane*, the court had not committed itself to a "formula." In *Mullane*, the court did just that. And as a subordinate court on matters of federal law, we are bound to employ that formula—even in cases where we find its application unfair or unwise.

preme Court progeny. First, in an attempt to avoid the constitutional minimum of notice by mail for known claimants, the majority seeks to distinguish this case from *Mullane* on the ground that the respondents' claims here "involve[] a large group of defendants, not the single parties or small groups considered in *Mullane* and its progeny." *Supra* ¶ 57. Second, the court offers a parallel contention focused on the nature of the taxpayer claims, asserting that they "involve[ ] a public, not a private interest," somehow distinguishing this case from *Mullane*. *Supra* ¶ 57. The premises of these arguments lack any support in the record, however, and they also fail under *Mullane* and its progeny. The court's other grounds for distinguishing or surpassing *Mullane* fail on similar grounds—they are factually unsupported and legally baseless.

## A

¶ 177 As to the number of claimants at issue in this case, the majority rests on the unsupported assertion that the taxpayer class of claimants is larger than the "small group[]" of claimants at issue in *Mullane*, *supra* ¶ 57, and too large to allow for individualized notice by mail. Yet, that assertion is doubly belied by the U.S. Supreme Court's *Mullane* opinion. 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865. For one thing, the court misperceives the *Mullane* baseline. The group of beneficiaries whose claims were at issue in *Mullane* was hardly small. The case involved 113 separate trusts and an unenumerated—but admittedly very large—number of claimants.[5] And in any event, the mere number of claimants is not a factor that alone could justify abandoning the constitutional mini-

mum of first-class mail established under the methodology of the *Mullane* opinion.

¶ 178 *Mullane* established that minimum requirement unequivocally—while also rejecting publication as a form of notice for known claimants—under an analysis that assessed the relative costs and benefits of the two methods of service. Specifically, the court rooted its requirement of notice by mail in the conclusion that a "prudent man of business, counting his pennies but finding it in his interest to convey information to many persons whose names and addresses are in his files," *id.* at 320, 70 S.Ct. 652, would deem newspaper publication a mere "feint," *id.* at 315, 70 S.Ct. 652—not near enough to qualify as "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action," *id.* at 314, 70 S.Ct. 652.

¶ 179 We are in no position to second-guess the U.S. Supreme Court's assessment on that score, as it is a square holding on a matter of federal constitutional law that therefore binds us as a subordinate court. Certainly we cannot do so on the basis of our unexplained, generalized sense that we would set the constitutional bar elsewhere. *See supra* ¶ 64 (concluding, without any specific cost-benefit analysis or support in the record, that "publication is the only reasonable method of providing notice" given the "sheer number" of claimants). To justify altering the first-class mail minimum established in *Mullane*, we would have to engage in a careful cost-benefit assessment of the reasonableness question[6] under the facts and circumstances of the case before us—concluding, for example, that notice by mail is unreasonable and a substitute form of notice is reasonable in light of the relative costs and benefits that a prudent businessperson would consider.[7]

5. *See Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 309, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (noting that "a total of 113 trusts, approximately half inter vivos and half testamentary, participated in the common trust fund," and that "[t]he record does not show the number or residence of the beneficiaries, but they were many and it is clear that some of them were not residents of the State of New York").

6. It is no answer to suggest, as the majority does, that *Mullane* is satisfied by a balancing of "the individual interest, the government's interest, and the likely benefit of substitute or additional

notice when determining the reasonableness of notice." *Supra* ¶ 56 n.10. Again, this is *Mathews* balancing. It is not an appropriate substitute for the analysis required under *Mullane*, as *Dusenbery* confirms.

7. Concern for the volume of claimants at issue conceivably could sustain the conclusion that some form of electronic notice might be sufficient in a case where each individual claim is of minimal value. *Mullane* may leave room for a technological update to the requirement of first-class mail service, potentially permitting principal notice by email or some form of electronic

¶ 180 If the sheer number of claimants could justify the use of publication notice in place of individualized mailing, then surely that approach would have been upheld in the class action setting. It has not been. Even in cases involving millions of claimants with low-value claims, the courts consistently have required the individualized notice called for under *Mullane* before their claims can be subsumed into and foreclosed by a judgment in a class action suit.[8]

¶ 181 In the class action context, the question whether to require notice to individual members arises only with respect to claimants whose identity or whereabouts are not reasonably identifiable. *See* 7AA CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1786 (3d ed. 2012). Where there "is an existing document or readily accessible source that names them," individual notice (by mail or its equivalent) is unquestionably required. *Id.* (citing cases).[9] Even in cases involving millions of class members, the only circumstance in which individual notice may conceivably be dispensed with is where there is no accessible source of their identity or location. *Id.*[10] And even then, the cases do not dispense

---

delivery when such a method is all that is reasonable under the circumstances. *See, e.g., Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017 (9th Cir.2002) ("To be sure, the Constitution does not require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond. In proper circumstances, this broad constitutional principle unshackles the federal courts from anachronistic methods of service and permits them entry into the technological renaissance." (citation omitted)).

But although direct electronic communication may, in some instances, satisfy due process, *Mullane* leaves no such room for a first-resort use of publication notice. 339 U.S. at 315, 70 S.Ct. 652 ("It would be idle to pretend that publication alone ... is a reliable means of acquainting interested parties of the fact that their rights are before the courts."). Thus, there is no support in *Mullane* or elsewhere for what our court majority has done in this case"effectively jettisoning the essence of *Mullane* based on a generalized, unsupported reconsideration of the essence of its holding that publication notice is insufficient as a matter of due process.

8. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–76, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (applying the *Mullane* standard to a class action involving 2,250,000 members and rejecting the argument that the court "should dispense with the requirement of individual notice" in light of the "prohibitively high cost of providing individual notice" to all class members, and noting that in requiring individual service under rule 23, the rule committee sought to "fulfill requirements of due process to which the class action procedure is of course subject"); *Friends of Chamber Music v. City & Cnty. of Denver*, 696 P.2d 309, 317–18 (Colo. 1985) (observing that "notice by publication may *supplement* notice to identifiable class members, but such notice can comport with due process only if there is a maximum opportunity for notice to the absentee class member," and concluding that where "several other reasonable steps could have been taken to identify and notify individual class members," publication notice in

"each of the two major Denver metropolitan newspapers.... may have been insufficient constructive notice even to supplement notice to identifiable class members." (emphasis added) (internal quotation marks omitted)).

9. *See, e.g., Mader v. Armel*, 402 F.2d 158, 161 (6th Cir.1968) (holding that even though the class consisted of "about twelve hundred shareholders," because their "names and addresses [we]re in the possession of counsel for plaintiff... [t]here should be no difficulty in giving adequate notice if and when the District Court determines that notice should be given."); *Cosgrove v. First & Merchs. Nat'l Bank*, 68 F.R.D. 555, 559 (E.D.Va.1975) (requiring a plaintiff in a class action against a bank based on the bank's charging an initial fee on cash-advance credit-card transactions "to gather the relevant names and addresses from the [bank's] records ... and mail [the] proper notice [to] each class member").

10. *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 538, 547–49, 552 (N.D.Ga. 1992) (ruling that although "individual notice must be provided to those class members who are identified through reasonable effort," plaintiffs in class antitrust litigation did not have to search and match credit-card records of settling and bankrupt defendants or conduct a manual search of microfiche records maintained by all defendants in order to identify individuals because such a search was not "reasonable," and publication would suffice for those class members that were not known (internal quotation marks omitted)); *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417, 436–37 (D.N.M. 1988) (holding that "send[ing] notices out via ... monthly billing statements" to potential class members was sufficient to provide individual notice to them since the alternative—requiring plaintiffs to retrieve the names of all the defendant's inactive customers for the past five years from the telephone company's microfiche telephone-number records—would be unreasonable

with individualized notice altogether, as our court does today. They simply require notice for class members who can be reasonably identified, leaving publication as a supplemental backup, not the primary method of notice.[11]

¶ 182 The majority's reliance on the large number of taxpayer claimants in this case cannot stand under this precedent.[12] For one thing, the numbers themselves—tens or at most hundreds of thousands, *supra* ¶ 65—come nowhere near the multiple millions of claimants at stake in large class action litigation. And if in that setting individualized notice is required for even the many millions of class members who can be identified

in light of the large cost and futility of such a search).

11. *See, e.g., In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 360 (E.D.Pa.1976) (noting that the court would require the designated representatives of a class of industrial sugar consumers to make a reasonable effort to notify class members and to identify those members by the membership lists of the trade associations, the mailing lists for periodic trade journals, other directories, and the sugar refiners' sugar sales records).

12. The majority's attempt to distinguish these class action cases is rooted in a misunderstanding of my reasons for citing them. The point of these cases is simply to undermine a central premise of the majority's decision"that the existence of large numbers of claimants somehow justifies the use of publication as a constitutionally adequate means of service. Those cases thoroughly undermine that point, and the import of the cases is not at all disturbed by the majority's notion that if this case were pressed in a class action it would be a rule 23(b)(1) class and not a 23(b)(3) class. *Supra* ¶¶ 77–78. First, the fundamental requirements of due process extend to all forms of class actions, and the case law suggests that publication may be insufficient as a primary form of notice even for (b)(1) or (b)(2) classes. *See, e.g., Eisen*, 391 F.2d at 564 (2nd Cir.1968) (stating that individual notice is required in 23(b)(1) and 23(b)(2) class actions, not just in 23(b)(3) ones); *Richmond Black Police Officers Ass'n v. City of Richmond*, 386 F.Supp. 151, 158 (E.D.Va.1974) (same). Second, and in any event, to the extent class representation may be viewed as a substitute for individualized notice, see *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 963–64 (3d Cir.1983) (suggesting that class representation in a 23(b)(1) class may be an adequate substitute for individual notice in some cases), in this case *there is no substitute*, as no claimant has been designated or even purports to serve as a representative of the claimants whose claims will be foreclosed without notice. The Attorney General does not fulfill that role, despite

through a readily accessible source, then *a fortiori* such notice is required here.

¶ 183 The majority vaguely protests that it may be difficult for the City "to obtain property owner addresses from Salt Lake County." *Supra* ¶ 69. That seems unlikely. I suspect that the process of gathering that information from the County would be quite straightforward (at least as simple as that routinely required in class action litigation). At a minimum, the court should not assume the contrary, but should at least consider the possible need for a remand for presentation of evidence of the nature and extent of the accessibility problem. And even if there is

the majority's insistence that he does. *See supra* ¶ 76 n.17. The Attorney General was neither charged with acting nor did he purport to act as a formal representative of the absent taxpayers whose rights are being foreclosed by this suit. His participation accordingly changes nothing.

Thus, there is no basis for the court's conclusion that "[c]lass actions provide an instructive example for evaluating whether the notice provided in this bond validation proceeding satisfied due process." *Supra* ¶ 73. To the extent 23(b)(1) cases suggest that individualized notice may not be required, it is on a ground not even plausibly presented here, as this is neither a class action nor any other kind of representative suit. *See Pelt v. Utah*, 539 F.3d 1271, 1285–86 (10th Cir.2008) (explaining that because 23(b)(1) and 23(b)(2) class members may not receive individual notice and "must necessarily rely on the [class] representative to protect their interests[,] ... the propriety and adequacy of representation accorded to absent class members by the named parties in (b)(1) and (b)(2) actions should be *critically evaluated* before their rights are foreclosed" (emphasis added) (internal quotation marks omitted)); *Walsh*, 726 F.2d at 963–64 (explaining that "in Rule 23(b)(1) and (b)(2) class actions" individual notice to all class members is not always required because "an *adequate* class representative can, as a matter of due process, bind all absent class members by a judgment" (emphasis added)); *see also Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 256 (3d Cir.1975) (explaining that a "due process problem [under *Mullane*] surfaces" even in the context of a 23(b)(2) class action, but noting that "due process [does not] ineluctably require[] notice in all (b)(2) class actions" because the appointment of an "adequate and faithful" class representative is a "mandatory requirement for the maintenance" of such a class action and, in fact, "[i]f the representation proves inadequate, members of the class [are] not ... bound"). So if the (b)(1) cases identified by the majority are at all instructive, it is in confirming the problematic nature of the use of publication notice in a nonrepresentative suit (even one involving large numbers of claimants).

such a problem, that would at most justify giving individualized notice to those taxpayers whose addresses are readily identifiable, not resorting to publication for any and all of them.[13]

### B

¶ 184 As for the nature of the taxpayers' claims, I acknowledge that the claims at issue here may be deemed to involve a "public, not a private interest," in that they involve a challenge to the issuance of government bonds based on a general impact on the claimants' property taxes. *Supra* ¶ 57. And for that and other reasons, the court is right to note that the Attorney General has a statutory responsibility to ensure that the bond's validity undergoes outside scrutiny before the court may grant the validation petition, and may have a point in suggesting that the taxpayer claimants' interests may be effectively "vindicat[ed]" by "several representative defendants." *Supra* ¶ 72.

¶ 185 But again, these facts do nothing to sustain the court's decision to abandon individualized notice in favor of mere publication. In fact, the majority's analysis is foreclosed by *Richards v. Jefferson County*, 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996), which held that individual litigants have a due process right to "their own day in court" even in cases involving constitutional challenges to a government tax. *Id.* at 803, 116 S.Ct. 1761.

¶ 186 Petitioners in the *Richards* case were citizens of Jefferson County, Alabama, who filed a state-court class action challenging the county's occupation tax on constitutional grounds. The Alabama courts held that suit precluded by a prior adjudication of the tax in an action brought by the acting director of finance for the city of Birmingham, which was consolidated with a suit by three individual taxpayers, who were deemed to adequately represent the *Richards* petitioners' interests. *Id.* at 796, 116 S.Ct. 1761. On certiorari, the U.S. Supreme Court reversed, holding that petitioners had a due process right to notice of and representation in the prior litigation, which rights were infringed by the Alabama courts' application of state laws of preclusion. *Id.* at 797–98, 116 S.Ct. 1761. In so holding, the *Richards* Court rejected arguments like those embraced by the majority today—that petitioners' right to notice was altered by the public nature of their claims and by the representation of their interests by the participating taxpayers and by the acting finance director. *Id.* at 801–02, 116 S.Ct. 1761. Specifically, and in terms of relevance here, the *Richards* Court explained:

> The Alabama Supreme Court concluded that the "taxpayers in the [prior] action adequately represented the interests of the taxpayers here," but the three county taxpayers who were parties in [the prior] action did not sue on behalf of a class; their pleadings did not purport to assert any claim against or on behalf of any nonparties; and the judgment they received did not purport to bind any county taxpayers who were nonparties. That the acting director of finance for the city of Birmingham also sued in his capacity as both an individual taxpayer and a public official does not change the analysis. Even if we were to assume ... that by suing in his official capacity, the finance director intended to represent the pecuniary interests of all city taxpayers, and not simply the corporate interests of the city itself, he did not purport to represent the pecuniary interests of county taxpayers like petitioners.... [Thus,] we are unable to conclude that [these] plaintiffs provided representation sufficient to make up for the fact that petitioners neither participated in, nor had the opportunity to participate in, the [pri-

---

13. The majority insists that "notice by mail would impose administrative and financial burdens on the City, as compared to notice by publication," and that, in any event, it would "offer[ ] no additional benefits." *Supra* ¶ 69. Apparently, the gist of this analysis is the notion that since certified mail is not certain to reach all defendants, publication is just as equally suited to the task and even easier to undertake. But the appro-priate response to the practical difficulties of individual service on a large number of defendants is not to give up any effort at individual notice and resort to publication. It is to do the careful cost-benefit analysis required under *Mullane* and to require the notice that is reasonable under all the circumstances (even if it may not reach all defendants).

or] action. Accordingly, due process prevents the former from being bound by the latter's judgment.

*Id.* at 801–02, 116 S.Ct. 1761 (citations omitted).

¶ 187 This analysis precludes the majority's reliance on the "public" nature of the taxpayer claimants' interests to foreclose their right to individual notice. As in *Richards*, none of the participants in this proceeding purported to sue in a capacity in which they represented the pecuniary interests of any nonparticipating taxpayers.[14] Even the Attorney General, whose participation the majority credits as ensuring that the bond's validity undergoes outside scrutiny, *supra* ¶¶ 70, 81, is not acting in a purely or permanently representative capacity.[15] His ultimate action in the case, moreover, was not to litigate any challenge to the issuance of the bonds, but simply to bow out after a preliminary determination that he saw no obvious defect in the City's petition and that other private parties would "competently contest the petition."[16] *Supra* ¶ 70 (internal quotation marks omitted).

¶ 188 The *Richards* case also forecloses the majority's analysis in another way. *Richards* went on to reject the argument that "in cases raising a public issue of this kind [a constitutional challenge to a tax], the people may properly be regarded as the real party in interest and thus that petitioners received all the process they were due" through the prior litigation. 517 U.S. at 803, 116 S.Ct. 1761. It did so on the ground that "the Alabama Supreme Court did not hold

here that petitioners' suit was of a kind that, under state law, could be brought only on behalf of the public at large." *Id.* at 804, 116 S.Ct. 1761. Thus, although the *Richards* Court recognized that "the States have wide latitude to establish procedures not only to limit the number of judicial proceedings that may be entertained but also to determine whether to accord a taxpayer any standing at all," it went on to hold that once a state elects to recognize a taxpayer claim, it must afford the same notice to that claim as it grants to any other claimant. *Id.* at 803–04, 116 S.Ct. 1761. Thus, the taxpayer "chose in action" recognized by Alabama in *Richards* was a "protected property interest" sustaining full due process rights to notice, not a "public" right to be brought by a government official or class representative. *Id.* at 804, 116 S.Ct. 1761.

¶ 189 *Richards* requires the government to take the bitter with the sweet. Under *Richards*, the government may have the latitude to eliminate private rights of action for "public" claims involving bond validity. But once it recognizes individual rights of action, it must also confer constitutionally required notice before it forecloses those rights in litigation. That is a federal constitutional imperative, whether or not the claim is characterized as somehow "public."

¶ 190 The court runs afoul of that imperative today. Its decision foreclosing taxpayer claimants' rights on the ground that they are "public" and adequately represented by oth-

---

**14.** The majority claims that *Richards* is distinguishable because the Birmingham finance director in *Richards* had not "purport[ed] to represent the pecuniary interests" of third party taxpayers, whereas the defendants in this case "share a public interest," such that "a few representatives may vindicate the interests of the larger group." *Supra* ¶ 81 (internal quotation marks omitted). That is a nonsequitur. The mere existence of a common interest is nowhere near enough to demonstrate representative litigation. The *Richards* caveat cited by the majority concerns representative litigation, as by a class representative. This case involves nothing of the sort.

**15.** Although the Attorney General is tasked with determining the validity or effectiveness of the

proposed bond petition and contesting any invalid or defective bond petitions, he may ultimately defer this responsibility "if one or more other parties to the action will, in the attorney general's opinion, competently contest the petition." Utah Code § 11–30–6(1).

**16.** The majority disputes this characterization, insisting that the Attorney General's representatives continued to play some role throughout the proceedings. *Supra* ¶ 81 n.18. Whatever the Attorney General's ongoing role, however, one critical point is clear: He was neither charged with acting nor did he purport to act as a formal representative of the absent taxpayers whose rights are being foreclosed by this suit. His informal participation accordingly cannot excuse compliance with the mandate of *Mullane*.

ers cannot stand under *Richards*.[17]

### C

¶ 191 The majority's remaining grounds for distinguishing *Mullane* likewise fail. The majority's arguments against individualized notice are the product of speculation. I see no way to conclude that notice by mail "would provide no additional benefit to defendants." *Supra* ¶ 61. Certainly the record does not support this conclusion, as the district court never considered the relative benefit of individualized notice. And in my view this point is demonstrably incorrect. As *Mullane* and common knowledge confirm, publication is a "feint" and the mail is a "serious effort to inform." 339 U.S. at 315, 318, 70 S.Ct. 652. Surely there is substantial value in that serious effort, the court's contrary insistence notwithstanding.

¶ 192 The court's treatment of the supposed "administrative and financial burdens on the City," *supra* ¶ 69, is similarly speculative—and also dubious. I see no judicial notice basis for assuming the high cost of "gather[ing] ... addresses" for taxpayer claimants in Salt Lake City. *Supra* ¶ 69. Certainly, that does not follow logically from the fact (cited by the court) that "the City does not administer property tax records and would have to obtain property owner addresses from Salt Lake County." *Supra* ¶ 69. If pressed on the matter, I would assume the contrary. I would imagine that

taxpayer names and addresses would be there for the asking, particularly in a matter of public litigation where taxpayer interests are at stake and could be jeopardized.[18] We should not lightly assume that the county would hold that information back from the city. If in doubt about a matter that might jeopardize our citizens' constitutional right to notice, we should at least remand the case to allow for development of a record and findings.

¶ 193 That also goes for the court's ultimate conclusions that "notice by publication ... is reasonably certain to notify" the taxpayer claimants and that "notice by mail ... is unnecessary." *Supra* ¶ 72. These conclusions simply cannot stand under *Mullane*, particularly given the failure of all of the court's more particularized attempts to distinguish this case from that one. And even if there were some basis for distinguishing *Mullane*, we could not possibly do so on the instant record, which tells us nothing about the relative costs and benefits of publication as compared to service by first-class mail or its equivalent. Thus, even if we had some doubts about the impact of a requirement of individualized notice, the proper outlet for those doubts would be a remand for the careful analysis of reasonableness required under *Mullane*—not a categorical assertion that publication is good enough and individualized notice is unnecessary.[19]

17. The majority also seeks to distinguish *Richards* on other factual grounds, *supra* ¶ 81, but its additional points are all distinctions without a difference. *Richards* stands for two general propositions, which are unaffected by the factual nuances cited by the majority and which thoroughly undermine its analysis. It holds that the Due Process framework in *Mullane* cannot be evaded by (1) the mere appendage of the label of "public" to the rights at issue in a case or (2) the bare assertion that a public official is a party to the litigation in a purportedly representative capacity.

None of the majority's factual distinctions affect either of these points. For example, it may be true that the underlying judgment in *Richards* did not itself purport to bind nonparties without notice. *Supra* ¶ 81. But the whole point of the *Richards* case was that the initial proceeding would ultimately have that effect as a matter of Alabama preclusion law. See *Richards*, 517 U.S. at 799, 116 S.Ct. 1761. Indeed, the issue before the court in *Richards* was whether the binding

effect of the decision under state preclusion law raised federal due process problems. See *id.* at 801, 116 S.Ct. 1761. Thus, the *Richards* case is on point in all relevant respects, and the majority's attempts to distinguish it are unavailing.

18. This is a sticking point for the parties, but one aspect of it appears to be uncontested: At the very least, the city's own tax and property records contain the names and addresses of all of the city's taxpayers and property owners. And as for *those known individuals*, it can hardly be a burden, let alone an unreasonable burden, to require the city to provide individual notice.

19. Even if publication notice generally could be sustained as reasonable under the Due Process Clause, I see no reason to sustain the decision to approve publication in the *Commercial Record*. Under *Mullane's* reasonableness requirement, I fail to see how publication in a relatively obscure periodical could satisfy the requirement that notice be "reasonably calculated, under all the cir-

### III

¶ 194 In upholding service by publication in this case, the majority establishes a dangerous precedent. If our opinion today is accepted at face value, it will open the door to the use of mere publication as a first-line method of service in any case in which the class of claimants is large and their claims are "public" in the sense of a taxpayer challenge to a tax or government program. Granted, the court identifies some other circumstances of this case that purportedly distinguish it from *Mullane*—that time is of the essence in a bond validation proceeding, that some of the claimants may not be immediately identifiable, and that individualized notice is costly. But those same points can likewise be established quite routinely in a wide range of cases. So the effect of today's decision is significant, and the slipperiness of the slope is concerning.

¶ 195 To my knowledge, there is no generally applicable precedent endorsing this sort of wide-ranging use of publication as a primary method of service for known claimants. The only cases that come anywhere close are the ones cited by the majority that uphold publication in bond validation proceedings like the one before us here.[20] But those cases suffer from the same defects as our majority opinion does here—in that they are irreconcilable with *Mullane* and its progeny and rest on unsustainable attempts to ignore[21] or distinguish it.[22] I would accordingly reject those cases, as they are unfaithful to binding Supreme Court precedent and thus provide no real support for the result sought by the court here.[23]

cumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. at 314, 70 S.Ct. 652. A periodical of such small circulation is hardly the kind of notice that would catch the collective eye of Salt Lake City taxpayers, let alone apprise them of the pendency of a proposed tax burden in the form of a bond. No "prudent man of business, counting his pennies but finding it in his interest to convey information to many persons whose names and addresses are in his files," *id.* at 320, 70 S.Ct. 652, would choose the *Commercial Record* as the outlet for publication notice if his true goal were to apprise potential claimants of their right to sue. Thus, even if I could see a basis for upholding publication as the form of primary notice, I would not endorse the particular publication chosen in this case.

20. *Supra* ¶ 57 (citing *Jackson v. Waller Indep. Sch. Dist.*, No. 07–3086, 2008 WL 818330, at *7 (S.D. Tex. Mar. 24, 2008); *Thomas v. Ala. Mun. Elec. Auth.*, 432 So.2d 470, 477 (Ala.1983); *Keys Citizens for Responsible Gov't v. Fla. Keys Aqueduct Auth.*, 795 So.2d 940, 949–50 (Fla. 2001)).

21. *See Jackson*, 2008 WL 818330, at *7 (reasoning that because several states have concluded that "publication notice of bond validation proceedings" under statutes similar to the one at issue satisfied due process, "such notice is constitutionally sufficient").

22. *See Thomas*, 432 So.2d at 477 (holding that "[s]ervice of process by publication is acceptable where other methods do not offer a sensible or effective way of notifying parties to an action of the pendency of that action"); *Keys Citizens*, 795 So.2d at 948–50 (employing the *Mathews* test to "determine what process is constitutionally due" and concluding that under that standard, publi-

cation notice "gave citizens adequate notice of the [proposed government action]" (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976))). *But see Dusenbery v. United States*, 534 U.S. 161, 168, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (rejecting *Mathews* as "an all-embracing test for deciding due process claims," concluding that "[s]ince *Mullane* was decided, we have regularly turned to it when confronted with questions regarding the adequacy of the method used to give notice," and finding "no reason to depart from this well-settled practice" (internal citations omitted)).

23. The majority seeks to invoke *Jones v. Flowers*, 547 U.S. 220, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006), intimating that the opinion somehow supports the results reached in the bond validation cases the majority cites, *see supra* ¶ 58, but *Flowers* only undermines the court's conclusions. *Flowers* makes clear that the service required by due process must be by a method that would be chosen if the person sending the notice was "desirous of actually informing" a person of the contents of that notice. See *id.* at 229–30, 126 S.Ct. 1708 (internal quotation marks omitted). Thus, the *Flowers* court held that service by certified mail failed to satisfy due process where the letter was returned as undeliverable and the plaintiff failed to take additional steps reasonably available to it. *Id.* at 225, 126 S.Ct. 1708. Although the plaintiff in *Flowers* followed the undelivered certified letter with newspaper publication of the notice, the court deemed that insufficient under the Due Process Clause, as a reasonable person who learned of an undeliverable certified letter "would take further reasonable steps." *Id.* at 229–30, 126 S.Ct. 1708. That analysis thoroughly condemns the service employed in this case.

¶ 196 As to precedent on point in other states, the cases I find persuasive are those of the Michigan Supreme Court. That court has twice applied *Mullane* to state statutory schemes that purported to allow notice by publication as the primary or sole method of providing notice, and has twice rejected these schemes as violative of due process. *See Alan v. Wayne Cnty.*, 388 Mich. 210, 200 N.W.2d 628 (1972); *Ridenour v. Cnty. of Bay*, 366 Mich. 225, 114 N.W.2d 172 (1962). Notably, both cases shared *Mullane*'s critique of publication notice, stating that "when notice is a person's due process which is a mere gesture is not due process," *Alan*, 200 N.W.2d at 696 (internal quotation marks omitted), and that "[i]t would be idle to pretend that publication alone ... is a reliable means of acquainting interested parties of the fact that their rights are before the courts," *Ridenour*, 114 N.W.2d at 179 (quoting *Mullane*, 339 U.S. at 315, 70 S.Ct. 652).

¶ 197 In support of its conclusion that publication notice was inadequate, the *Alan* court cited *Mullane* for the proposition that although "due process [does not] require[] personal notification of every taxpayer," it does require "that the method of notice chosen must give reasonable assurance of actually giving notice in light of other available means." 200 N.W.2d at 696. And given this requirement, both cases concluded that publication notice simply was not "reasonably calculated to reach those who could easily be informed by other means at hand." *Id.* (internal quotation marks omitted); *Ridenour*, 114 N.W.2d at 179.

¶ 198 The majority seeks to undercut these decisions, but its bids to do so fall flat. The notion that *Ridenour* applied *Mullane* in a "formulaic" manner, *supra* ¶ 59, is hardly cause for concern. *Mullane* prescribes a due process formula, so a "formulaic" application

of that decision is, quite simply, a faithful one. The court's contrary view—that the public nature of the claims at issue and the large number of bond claimants require special tailoring of the *Mullane* standard—is untenable for all of the reasons explained above.

¶ 199 The majority's critique of the *Alan* case is similarly faulty. After lamenting the *Alan* court's "formulaic" application of *Mullane*, the court proceeds to identify a series of factual distinctions between the *Alan* case and this one. *Supra* ¶¶ 59–60. Yet, the court fails to explain how or why any of these differences are relevant under *Mullane*, and they are not. In this case as in *Alan*, taxpayer claimants' rights are being "cut[] off" without any attempt at individualized notice. 200 N.W.2d at 696. So the issues and appropriate analysis in both cases are identical, even if *Alan* did not involve a bond validation proceeding per se.[24]

¶ 200 In discounting these Michigan opinions, the court deepens a split in the state courts on what notice the Due Process Clause requires in bond validation proceedings. The split is significant, as it represents a longstanding difference of opinion on the requirements of due process for notice in a recurring form of proceedings in the state courts. At some point I suspect the U.S. Supreme Court will intervene to resolve the conflict in the state courts on this issue. When it does, I expect it will reaffirm what is clear from *Mullane* and its progeny, which is that the constitutional demands of due process are not met when known claimants' interests are foreclosed in a proceeding in which the only form of notice was the feint of publication. In my view our court errs in not reaching that same conclusion.

---

24. In a footnote, the majority also intimates that *Alan* actually supports its approach. *See supra* ¶ 60 n.12. While conceding that *Alan* found "notice by publication of the bond proceeding to be unconstitutional," the majority then cites dicta in *Alan* opening the door to modes of service other than mail. *See supra* ¶ 60 n.12. Yet the court cites that language out of context. It omits *Alan's* caution that, in considering these methods, "the question always to be asked of itself by the government is whether it has chosen a method it

would choose if it were *really desirous of actually informing the greatest number of electors of what their rights are.*" *Alan*, 200 N.W.2d at 697 (emphasis added). The *Alan* court made crystal clear that it understood the mandate of *Mullane*: "the method of notice chosen must give reasonable assurance of *actually giving notice* in light of other available means." *Id.* at 696 (emphasis added). The majority's approach eschews this rule, and it is thus incompatible with *Alan*.

## IV

¶ 201 I am sympathetic to the result achieved by the court today. If the question before us were whether we preferred protracted bond validation proceedings or expeditious ones, my clear preference would be for the latter. But that is not the question presented for our resolution. And achieving outcomes that satisfy our policy preferences is not our function.

¶ 202 We are tasked instead with deciding the cases that come before us in accordance with the rule of law—whether or not it yields an outcome we favor on policy grounds. That's what distinguishes this branch of government from those that perform more purely political policymaking roles. We undermine our authority when we blur this distinction. I see no way to sustain the decision the court reaches today without so doing.

¶ 203 That is not to say that our law binds us permanently to the path of protracted litigation in matters involving bond validation. A policymaker intent on facilitating finality in such cases could easily do so—for example, by enacting a short-fused statute of limitations or repose,[25] or assigning the right of action to a representative litigant,[26] like a government official. Those approaches seem entirely sensible, and would effectively achieve the result sought by the court today.

¶ 204 The problem is that our legislature has not seen fit to adopt either of these approaches. It has recognized private rights of action for all interested taxpayers, designating them as parties-defendant in a suit to be filed by the government entity issuing the bond. And that decision commits us, under the Due Process Clause, to a right of those litigants to individualized notice on par with that provided by first-class mail. Our discomfort with that result is not a license to reject it. In so doing we distort the law on the constitutional dimensions of the notice required by due process. I accordingly dissent.

---

25. *See, e.g.,* Wyo. Stat. Ann. § 22–21–107 (2012) (allowing "[a]ny five (5) qualified electors of [a] political subdivision" to "contest an election on the question of the creation of an indebtedness" but only if the suit is filed "within fourteen (14) days after the result of the election [has] been determined" and providing that "[n]o civil action contesting the results of such an election or alleging election errors may be commenced after the expiration of such fourteen (14) day period"); *see also* Utah Code § 78B–2–313(2) (newly enacted [in 2012] short, three-month statute of limitations imposed on lenders for collecting deficiencies following short sales).

26. *See, e.g.,* Wash. Rev. Code Ann. § 7.25.020 (West 2012) (statutorily establishing a bond validation process in which the court appoints a taxpayer representative to vindicate the rights of "all interested parties").